[No. 17973-0-I. Division One. September 28, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIAM ROGER JONES, *Appellant.*

*Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michael Danko* and *Jeanette M. Dalton, Deputies,* for respondent.

WEBSTER, J.—Appellant William Roger Jones appeals from his judgment and sentence entered after a jury found him guilty of premeditated first degree murder. RCW 9A.32.030. He claims that the court erred (1) by failing to dismiss his case for violation of his right to a speedy trial and (2) by allowing testimony from the State's psychiatrist in violation of his constitutional right to counsel and his privilege against self–incrimination. We affirm.

## FACTS
### A
### SUBSTANTIVE FACTS

On February 15, 1985, William Roger Jones killed Pauline Rodde in his University District apartment. Rodde went home with Jones after meeting him in a Seattle bar. He strangled her on his bed with a pair of panty hose and, while she was unconscious, stabbed her 12 times. After she was dead, he attempted to have intercourse with her, and later climaxed in her mouth. Jones cleaned himself off in the bathroom with a towel. He then returned to bed and fell asleep.

Jones later woke up and put Rodde's body under the bed. He packed a suitcase and caught a bus to the Greyhound bus depot. When he realized that there were no buses leaving at that hour, he left his suitcase in a locker and went drinking. He drank most of the day, until he became intoxicated. During that time, he lost his wallet,

leaving him without enough money to purchase a bus ticket. Jones walked back to his apartment, checked to see that the body was still under the bed, and then went back to sleep.

Jones awoke around 1 a.m. on February 17, 1985, and went looking for the police. He found them at a donut shop about 10 blocks away and turned himself in. After *Miranda* warnings were given, Jones waived his right to remain silent. He then took the officers to his apartment where Rodde's body was found under the bed.

## B
### PROCEDURAL HISTORY

Jones was charged by information with premeditated first degree murder. The charge was later amended to premeditated first degree murder and first degree felony murder in the course of committing rape in the second degree, rape in the third degree, and indecent liberties. Jones was committed to Western State Hospital for a determination of his competency to stand trial and a possible "not guilty by reason of insanity" (NGI) defense. He filed a pro se objection to his commitment declaring that he was already being evaluated by his own psychiatrist for a possible NGI defense. Jones also filed a writ of habeas corpus objecting to his Western State commitment and a motion to suppress the Western State reports.

Two hearings relevant to this appeal were held prior to trial. The first was a 4–day competency hearing which concluded on October 10, 1985, when Judge Noe ruled that Jones was competent to stand trial. He heard testimony from Dr. Philip G. Lindsay, who advanced the theory that Jones has multiple personalities, and at the time of the killing, the personality known as "Animal" had taken over. Dr. Lindsay based this theory on the sudden nature of the killing and on three interviews he had with Jones during August 1985 when Jones was injected with amobarbital, a drug that induces a hypnotic trance. He also heard testimony from Dr. Kathleen Mayers, a clinical psychologist,

who observed Jones at the King County Jail and at Western State. She concluded that Jones was suffering from an obsessive compulsive personality disorder but that he was competent to stand trial. At the second hearing on October 24, 1985, Judge Pekelis denied Jones' motion to dismiss for violation of his speedy trial rights and ruled that the speedy trial expiration date was December 26, 1985.

The jury trial commenced on December 26, 1985, with Judge Tuai presiding. Jones entered a plea of NGI on that date. Both Dr. Lindsay and Dr. Mayers testified extensively concerning Jones' sanity. Testimony from Jones' sister, his employer, and a friend depicted Jones as a moody, tense person with drinking problems, but one who was capable and bright. In fact, Jones was a law school graduate. The jury found Jones guilty of first degree premeditated murder while committing or attempting to commit rape in the second degree. He was sentenced to a term of 280 months in the Department of Corrections. Jones appealed, contesting the court's determination of his trial date and the admission of testimony by the State's psychiatrist.

## C
### Speedy Trial Facts

Jones was arraigned on February 22, 1985. The speedy trial expiration date was April 23, 1985. However, Jones exercised three waivers: On March 18 he waived his trial to July 1; on June 7 he extended the waiver to August 15; and on July 8 he extended the waiver to October 15. On July 24 Jones was committed to Western State to determine his competency to stand trial, and on October 10 he was declared competent to stand trial.

On October 16, 1985, the State filed an order setting the trial date for November 21. Jones objected, arguing that his speedy trial date had expired on October 15. Although Jones agreed that the 78–day competency evaluation period should be excluded from the speedy trial period, he asserted that because his competency was established prior to October 15, the last day of the speedy trial period should

still be October 15. The State argued that the 78–day period should be attached and extended forward from the October 15 date. The court agreed with the State and set the expiration of the speedy trial period at December 26, 1985.

### Speedy Trial Right

Jones first claims that his case should have been dismissed because his right to a speedy trial was violated. Although the selection of a proper trial date is the mutual task of both court and counsel, the ultimate responsibility lies with the court. *State v. White,* 94 Wn.2d 498, 503, 617 P.2d 998 (1980); CrR 3.3(a). The sanction of dismissal with prejudice results when CrR 3.3 is not followed. CrR 3.3(i). Because Jones was detained in jail, he was required to be brought to trial within 60 days of his arraignment—by April 23, 1985. CrR 3.3(c)(1).

However, motions by both Jones and the State extended the April 23 date. First, Jones exercised three waivers, the last of which expired on October 15. A waiver that contains an explicit expiration date tolls the running of the 60–day speedy trial limitation. *State v. Ramsay,* 41 Wn. App. 380, 383, 704 P.2d 657 (1985); *State v. Burroughs,* 23 Wn. App. 190, 192, 596 P.2d 1340, *review denied,* 92 Wn.2d 1033 (1979). Second, the State moved to commit Jones to Western State until his competency could be determined. CrR 3.3(g)(1) excludes "[a]ll proceedings relating to the competency of a defendant to stand trial, terminating when the court enters a written order finding the defendant to be competent". *See State v. Bebb,* 108 Wn.2d 515, 740 P.2d 829 (1987). The commitment period, which lasted from July 24 until October 10, covered 78 days.

The court properly allowed the 78–day excluded period to be *added* to the expiration of Jones' waiver rather than *included within* the waiver period. We find *State v. Bernhard,* 45 Wn. App. 590, 726 P.2d 991 (1986), *review denied,* 107 Wn.2d 1023 (1987) instructive. In *Bernhard* the defendant had been charged with two separate crimes in

two different counties. The court determined the proper date for arraignment on the second charge under CrR 3.3(g)(2), which excludes from computation of the time for arraignment "[p]reliminary proceedings and trial on another charge". The court held that the date for arraignment on a second charge was to be computed after the *entire period* that the defendant was involved in trial on the first matter. *Bernhard,* at 598.

■ Similarly, we find that the entire competency determination period must be excluded from computation. In the usual situation, the exclusion merely extends the defendant's 60–day period until trial. However, in a situation such as Jones' where the exclusion falls within a waiver period, the exclusion must be tacked onto the waiver period. We thus treat the exclusion and the waiver separately, recognizing that these periods exist for different reasons. The competency determination period is a neutral period in which neither side is certain that the defendant will be tried. By contrast, a waiver is often exercised to allow the defendant more time to prepare his defense. In sum, the waiver and the exclusion, being exercised for different reasons, must be treated separately.

### State Psychiatrist's Testimony
### Regarding Sanity

Jones next objects to Dr. Mayers' rebuttal testimony in which she was questioned at length regarding his sanity. Because of the constitutional nature of this claim, Jones' failure to object at trial does not preclude review. RAP 2.5(a)(3).

At trial Dr. Mayers testified that she based her conclusion that Jones was sane upon contacts with him in jail and at Western State. The first was an 8–minute discussion on July 8, 1985, in the King County Jail. At that time Jones refused to participate in an interview with the State because he claimed he would be presenting a psychiatric defense. Dr. Mayers testified that during this discussion Jones appeared to be logical, coherent, and not "floridly

psychotic." She said there was no indication that he was suffering from any major mental illness. He was scrupulously clean, his hair was combed neatly, and he used language in a very precise manner. Her second contact with Jones was at Western State during the competency determination period. She observed that during his commitment he displayed good hygiene habits, read and wrote extensively, commented frequently about his desire to remain silent, and complained about noise on the ward. She had one private interview, and the ward psychiatrist had a couple of private interviews with him. Based on these contacts, Dr. Mayers opined that Jones was suffering from a compulsive personality disorder rather than a multiple personality disorder. She concluded that he was sane and competent to stand trial.

## A
### TIMING OF THE PSYCHIATRIC EXAMINATION

[3] Jones argues that because Dr. Mayers' observations were made prior to his raising the NGI defense,[1] her comments were inadmissible. We disagree. We find *State v. Bonds*, 98 Wn.2d 1, 653 P.2d 1024 (1982), *cert. denied*, 464 U.S. 831 (1983) instructive. In *Bonds* the Washington State Supreme Court upheld the admissibility of testimony by a state–appointed psychiatrist where the NGI plea was entered after the psychiatric examination had been performed. Although the examination was originally scheduled for purposes of a juvenile decline hearing, results of that examination were also allowed in rebuttal testimony at the trial in which the juvenile pleaded NGI. *State v. Bonds, supra* at 6. Similarly, we find no error here in admitting results of Dr. Mayers' examinations occurring prior to Jones raising the NGI defense.

## B
### RESULTS OF THE PSYCHIATRIC EXAMINATION

Jones next asserts that Dr. Mayers' testimony impermis-

---

[1]Dr. Mayers' observations occurred in July 1985. Jones entered his NGI plea on December 26, 1985.

sibly exceeded the subject of competency. He argues under *Estelle v. Smith,* 451 U.S. 454, 465, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981) that a defendant's statements uttered in the course of a psychiatric examination are not automatically removed from the reach of the Fifth Amendment.

We find that Jones' reliance on *Estelle* is misplaced. In *Estelle* the trial court ordered the defendant to be questioned by a psychiatrist to determine his competency to stand trial. However, at the sentencing hearing the psychiatrist was permitted to testify that the defendant posed a threat of future dangerousness to society. The jury then resolved the issue of future dangerousness, as well as two other sentencing issues, against the defendant, and he was sentenced to death under Texas law. The Court found objectionable the State's use of the defendant's own statements "unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty." *Estelle,* at 466.

 However, the Court distinguished the case in which a NGI defense has been raised:

> When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.

*Estelle,* at 465.

In this instance, we perceive no violation of Jones' Fifth Amendment rights. Jones' assertion of the NGI defense removed him from the reach of the Fifth Amendment. *See State v. Bonds, supra* at 20.

### Assistance of Counsel

Jones also objects to interviews held without assistance of counsel at the King County Jail and at Western State. By pleading NGI, a defendant relinquishes his right to have an attorney present when he is interviewed. *See, e.g.,*

*United States v. Cohen,* 530 F.2d 43 (5th Cir.), *cert. denied,* 429 U.S. 855 (1976); *United States v. Bohle,* 445 F.2d 54 (7th Cir. 1971); *United States v. Albright,* 388 F.2d 719 (4th Cir. 1968). In *Albright* the court explained the rationale for this rule:

> From the intimate and personal nature of the [NGI] examination, we are satisfied that, except in the unusual case, the presence of a third party, in a legal and non–medical capacity, would severely limit the efficacy of the examination, and that if defendant's privilege against self–incrimination is given full effect with regard to his inculpatory statements to his examiner, the need for the presence of an attorney is obviated.

*Albright,* at 726. Because Dr. Mayers revealed no inculpatory statements made by Jones regarding the killing, we conclude that here Jones was not prejudiced by the absence of counsel.

### References to Fifth Amendment Silence

Finally, Jones contends that Dr. Mayers' references to his exercise of the Fifth Amendment impermissibly penalized his insanity defense. On direct examination Dr. Mayers made the following comments concerning Jones' silence to which no objection was made:

> Q. [Defense Counsel] How did you conduct your examination or interview of the defendant on this occasion?
>
> A. [Dr. Mayers] I did what I typically do. I introduce myself. I indicate to the individual that he's not required by law to talk to me, and if any questions are offensive to him or her, that he doesn't need to answer. And I proceeded to ask him some background information.
>
> *Mr. Jones immediately made me aware of the fact that he didn't wish to take part in the evaluation,* and he read a statement, I believe that he had it in written form, perhaps he didn't, but I wrote the statement as he dictated, and I had him sign and date the statement.
>
> And other than some brief discussion which he was willing to do with me about his situation—that is, he indicated some information about why he didn't wish

to take part in the evaluation with me, we had very brief contact.

Q. What reason did he give you for not talking with you?

. . .

And he stated, unless the defendant's psychiatrist is allowed to complete his evaluation and diagnosis, defense will not be able to present a psychiatric defense at his trial. Therefore, *he believes he has a right, based on his Fifth Amendment right against compulsory self incrimination, not to participate in the evaluation.*

. . .

Q. About how long were you with the defendant on this occasion?

A. Well, not a very long time. *You know, Mr. Jones had told me that they did not want to take part in this procedure.* He declined the evaluation. He did discuss with me his reasons, for a few minutes, and he did dictate his statement. . . .

Q. Based on your initial contact with him, could you form an opinion about his ability to perceive what was happening to him, his orientation to date and time?

. . .

*It's a rare individual, indeed, who makes reference to his Fifth Amendment rights, and particularly in such an articulate manner.* He was logical. He was certainly coherent. On the basis of that brief contact, he certainly was not floridly psychotic. *There was absolutely no indication that he was suffering from any major mental illness.*

(Italics ours.)

In *Wainwright v. Greenfield,* 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634 (1986), the Supreme Court held that the State may not use a defendant's post–*Miranda* silence as evidence to counter a NGI defense. *Wainwright* involved comments during closing arguments in which the prosecutor stated that the defendant's repeated refusal to answer questions without first consulting an attorney demonstrated a degree of comprehension that was inconsistent with his plea of insanity. Jones' situation is distinguishable. First, Jones' own witness initiated discussion on the exercise of

Fifth Amendment rights. During direct examination Dr. Lindsay, the defense psychiatrist, testified as follows:

A. [Dr. Lindsay] In reviewing the reports from Western State Hospital, *it was difficult to assess, because he pled the Fifth Amendment,* and so they were left with simply observing him, rather than having the privilege of really interviewing and examining him in the manner which I had the opportunity to do.

\* \* \*

Q. [Defense Counsel] Would you describe what happened in that interview?

A. Yes. In that interview, 700 milligrams Amobarbital, or Amytal, was given intravenously in slow IV push. This was over the course of the first part of the hour. *He described his experience at Western State Hospital in which he pled the Fifth Amendment.* This is just early in the course, we are just beginning the infusion.

Second, whereas the comments in *Wainwright* occurred during closing arguments, the comments here were proper rebuttal testimony. When NGI is raised as a defense, great latitude is allowed in proving the mental condition of the accused. *State v. Huson,* 73 Wn.2d 660, 667, 440 P.2d 192 (1968), *cert. denied,* 393 U.S. 1096 (1969); *State v. Odell,* 38 Wn.2d 4, 20, 227 P.2d 710 (1951). In addition to Jones' mention of Fifth Amendment rights, Dr. Mayers considered many other factors as evidence of his sanity. Finally, Jones' silence did not follow assurances such as those given in a *Miranda* warning. Thus, there was no fundamental unfairness to Jones as there was in *Wainwright* where the State breached an implicit promise that silence would carry no penalty. *Wainwright v. Greenfield,* 88 L. Ed. 2d at 638. In conclusion, considering the context in which Dr. Mayers' remarks were made, we perceive no violation of Jones' Fifth Amendment rights.

Having determined that the date of trial was properly extended and that the exercise of Jones' Fifth Amendment rights was not penalized, we affirm.

SWANSON and COLEMAN, JJ., concur.

Review granted by Supreme Court January 5, 1988.