[No. 54533-2. En Banc. July 15, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIAM ROGER JONES, *Petitioner.*

*Julie A. Kesler* of *Washington Appellate Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Jeanette M. Dalton* and *Donna L. Wise, Deputies,* for respondent.

DURHAM, J.—A King County Superior Court jury found William Roger Jones guilty of first degree murder. He argues on appeal that his speedy trial rights were violated, and that testimony from the State's psychologist was improperly admitted on the issue of his insanity. Finding no error, we affirm the conviction.

## I

Jones confessed to the murder of Pauline Rodde. According to his statements to the police, he met her in a Seattle tavern on Friday afternoon, February 15, 1985. They drank together for a number of hours, and at approximately 9 p.m. took a bus to his apartment in the University District, stopping on the way to buy some food and wine. At approximately 11 p.m., he "made an advance to her", but she got up to leave. He grabbed her and strangled her until she was unconscious, then stabbed her repeatedly in the chest. Knowing that she was dead, he then had sexual intercourse with her, although he did not reach a climax.

After cleaning blood off himself with a towel, Jones crawled back into bed with the body and went to sleep. At approximately 4 a.m., he woke up, put the body under the bed, packed a suitcase, and left the apartment. He tried to catch a Greyhound bus out of town, but none were leaving at that time. He went to another tavern and drank for the rest of the day. He lost his wallet and therefore was unable

to leave town. He returned to his apartment, checked to see that the body was still under the bed, and then fell asleep. At 1 a.m. Sunday, he woke up and decided to turn himself in to the police. He found two police officers in their car some 10 blocks from his apartment, confessed his crime, and took them back to the apartment.[1]

Jones was charged with first degree murder. He was arraigned on February 22, 1985. Jones executed three waivers of his speedy trial rights on March 18, June 7 and July 8, respectively. The waivers continued in effect without interruption from March 18 through October 15.

In the meantime, Jones' competency to stand trial came into question. *See* RCW 10.77.060. The State's psychologist, Kathleen Mayers, interviewed him briefly in the King County Jail on July 8, but he indicated that he did not want to participate in the evaluation, citing his Fifth Amendment rights.[2] An order was entered on July 24 committing Jones to Western State Hospital in order to have his mental condition evaluated. The order reveals that the hospital was to evaluate both his mental condition at the time of the murder and his competency to stand trial. Jones was hospitalized between July 26 and August 2, during which time he cooperated in part with the examination, but he again asserted his rights in refusing to answer certain questions. Despite this refusal, Dr. Mayers was able to conclude that Jones was competent based on their conversations and his general appearance and behavior on the ward. Upon reading that report, Jones decided to have his own psychologist conduct an examination in order to rebut some

---

[1] In a pretrial hearing, these statements, along with evidence seized from the apartment, were found to be admissible at trial. Judge Steven Reilly held that the defendant had been properly advised of his *Miranda* rights, after which he knowingly and voluntarily confessed to the police and consented to their searches. Jones filed a series of motions in the Court of Appeals challenging these rulings, but he has not pursued those objections in this court.

[2] Jones is a recent law school graduate.

of the report's conclusions. This resulted in a considerable delay before the competency hearing could be held.

The 3–day competency hearing began on September 25. Dr. Mayers testified that Jones had a compulsive personality disorder but was competent to stand trial. The defense psychiatrist, Dr. Philip Lindsay, testified that Jones suffered from a multiple personality disorder to the extent that when he assumed certain personalities he was unable to assist in the defense of his case. On October 10, Superior Court Judge James Noe found Jones competent to stand trial. This ruling has not been challenged on appeal.

On October 24, a hearing was held before Judge Rosselle Pekelis regarding the proper calculation of Jones' speedy trial time under CrR 3.3. Jones contended that his speedy trial time expired along with his waiver on October 15. Judge Pekelis denied the motion to dismiss, concluding that the period for the incompetency proceedings should be added to Jones' waiver period. Accordingly, Jones' speedy trial period was extended through December 26. Trial was set for November 22 before Judge Liem Tuai.

For reasons not disclosed in the record, the trial was not held until December 26. On that day, Jones filed a document adding a plea of not guilty by reason of insanity to his previous general plea of not guilty. The jury trial centered primarily on the issue of insanity. The psychiatric experts of the State and defense testified much as they had at the competency hearing. The State's psychologist concluded that Jones had a compulsive personality disorder, but that his condition was not enough to render him insane at the time of the murder. The defense psychiatrist determined that Jones was insane when he committed the murder because his multiple personalities "paralyzed" his ability to distinguish right from wrong. Both witnesses revealed to the jury that Jones had exercised his right to remain silent during his interviews with Dr. Mayers. The jury rejected Jones' insanity defense and convicted him of first degree murder.

Jones appealed to the Court of Appeals, where his conviction was affirmed. *State v. Jones*, 49 Wn. App. 398, 743 P.2d 276 (1987). This court granted review. *State v. Jones*, 109 Wn.2d 1021 (1988).

## II

Jones argues that his speedy trial rights were violated when the trial court ruled that his trial began timely on December 26. Under Washington's "speedy trial" rule, if the State does not begin an incarcerated criminal defendant's trial within 60 days of arraignment, the case will be dismissed with prejudice. CrR 3.3(c)(1); CrR 3.3(i). Under certain circumstances, however, the State is given additional time in which to begin the trial. CrR 3.3(g) lists those situations in which time is to be excluded from calculation of the 60–day deadline:

The following periods shall be excluded in computing the time for arraignment and the time for trial:

(1) All proceedings relating to the competency of a defendant to stand trial, terminating when the court enters a written order finding the defendant to be competent;

(2) Preliminary proceedings and trial on another charge except as otherwise provided by CrR 3.3(c)(5);

(3) Delay granted by the court pursuant to section (h);

(4) The time between the dismissal of a charge and the defendant's arraignment or rearraignment in superior court following the refiling of the same charge;

(5) Delay resulting from a stay granted by an appellate court;

(6) The time during which a defendant is detained in jail or prison outside the state of Washington or in a federal jail or prison and the time during which a defendant is subjected to conditions of release not imposed by a court of the State of Washington;

(7) All proceedings in juvenile court.

A period of time that has been excluded under this rule does not count toward a defendant's "speedy trial time", so that, in effect, the excluded period is added to the end of the 60–day period.

Two of these exclusions are relevant to the present case. The first is CrR 3.3(g)(1) dealing with competency. Jones' competency proceedings took place between July 24 and October 10, a period of 78 days. The other relevant exclusion is CrR 3.3(g)(3) concerning delay granted by the trial court under section (h), which provides:

Continuances or other delays may be granted as follows:

(1) Upon written agreement of the parties which must be signed by the defendant or all defendants. The agreement shall be effective when approved by the court on the record or in writing.

(2) On motion of the State, the court or a party, the court may continue the case when required in the administration of justice and the defendant will not be substantially prejudiced in the presentation of the defense. The motion must be filed on or before the date set for trial or the last day of any continuance or extension granted pursuant to this rule. The court must state on the record or in writing the reasons for the continuance.

CrR 3.3(h). In this case, the delay granted by the court began on March 18, when Jones first waived the 60–day rule, and ran until October 15, when the second extension of the waiver expired.

The trial court took both of these exclusions into consideration by adding the 78 days attributable to the competency proceedings to the end of the defendant's waiver period. The defendant challenges this ruling, arguing that it is improper to exclude the same time period twice when it qualifies under two separate exclusions. Indeed, there is some support for this assertion, it having been held elsewhere that overlapping exclusions should not be counted twice. *See, e.g., United States v. Godoy,* 821 F.2d 1498, 1503 (11th Cir. 1987) (exclusions for continuances and pending pretrial motions) (citing *United States v. Robinson,* 767 F.2d 765, 770 (11th Cir. 1985) (exclusions for proceedings under advisement and pending pretrial motions)), *cert. denied,* 108 S. Ct. 778 (1988).

■ We conclude, however, that each exclusion should be given independent effect. When the trial court determines that there is reason to doubt the defendant's competency pursuant to RCW 10.77.060(1), the proceedings are placed in limbo. As in this case, the defendant may be placed in a mental facility for evaluation, thereby removing him physically from counsel and court. In any event, defense counsel may well be reluctant to consult with him on matters of trial preparation or strategy. In the meantime, counsel for both sides are prevented from significant trial preparation, such as scheduling of witnesses, preparation of exhibits, and, as is frequently the case with both the prosecuting attorney's and the public defender's offices, arranging their busy calendars for other matters. In short, during the pendency of a competency determination, much of both parties' preparation necessarily must be put on hold. Accordingly, that period of time must be excluded from whatever waiver period has been agreed on.[3] Thus, the trial court did not err in extending Jones' speedy trial deadline to December 26.[4]

## III

The State's clinical psychologist, Dr. Kathleen Mayers, testified at trial that Jones was sane at the time of the

---

[3]Resolution of the speedy trial issue in this case does not require this court to make any ruling on how speedy trial time is calculated *after* a waiver period elapses. Some cases suggest that speedy trial time is simply tolled during a waiver so that when the waiver expires, the rest of the 60–day period would then run before trial had to be held. *See, e.g., State v. Ramsay,* 41 Wn. App. 380, 704 P.2d 657 (1985). Another case suggests that the entire 60–day period might start running anew. *See Bremerton v. Hoyt,* 44 Wn. App. 135, 721 P.2d 539 (1986). Defense counsel claims that courts in other states hold that the trial must be held by the last day of the waiver period, so that no extra time is allowed to run. Petition for Review, at 10. We need not reach this issue. In this case, if the 78 days are tacked on to the end of the waiver period, then the trial was timely commenced under any of these theories.

[4]By our calculations, extending Jones' speedy trial time 78 days beyond October 15 would result in a new deadline of January 1, not December 26 as calculated by the trial court. However, Jones' trial was timely commenced under either calculation.

murder. Dr. Mayers' testimony was based on a series of meetings she held with Jones. She met him for a short time in the King County Jail on July 8, 1985. Dr. Mayers also met with him at Western State Hospital while he was committed there between July 26 and August 2. During these meetings, Jones exercised his Fifth Amendment right to remain silent in response to certain questions.

Jones contends that it was improper for Dr. Mayers to testify as to his sanity, citing *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981). In that case, the Court held that a defendant must be given *Miranda* warnings before he undergoes a competency evaluation by a court appointed psychiatrist. If the defendant does not waive his right to remain silent, the psychiatrist may proceed to evaluate the defendant's competency and may testify on that issue, but cannot testify as to sanity. *Estelle,* at 467–68. Because Jones did not waive his rights during his meetings with Dr. Mayers, he contends that it was error for her to testify concerning his sanity.

■ This argument, however, fails to take into account Jones' subsequent plea of not guilty by reason of insanity. By pleading insanity, a defendant waives his privilege against self–incrimination in psychiatric proceedings. *State v. Jones,* 99 Wn.2d 735, 749, 664 P.2d 1216 (1983) (citing *State v. Bonds,* 98 Wn.2d 1, 20, 653 P.2d 1024 (1982)), *cert. denied,* 464 U.S. 831 (1983); *see also Buchanan v. Kentucky,* 483 U.S. 402, 97 L. Ed. 2d 336, 107 S. Ct. 2906, 2917–18 (1987) (defendant waives the privilege when he attempts to introduce psychiatric evidence). Moreover, as the facts of *Jones* and *Bonds* show, the waiver applies even as to psychiatric examinations that precede the entry of the insanity plea.

Accordingly, even though Jones did not waive his rights at the time of the examinations, he did so later by pleading insanity. Because of this waiver, Dr. Mayers' testimony concerning Jones' sanity was properly before the jury.

## IV

Jones also contends that his Fifth Amendment rights were violated when Dr. Mayers told the jury that Jones had exercised his right to remain silent during their interviews. Dr. Mayers testified as follows regarding their interview in the King County Jail:

And [Jones] stated, unless the defendant's psychiatrist is allowed to complete his evaluation and diagnosis, defense will not be able to present a psychiatric defense at his trial. Therefore, he believes he has a right, based on his Fifth Amendment right against compulsory self incrimination, not to participate in the evaluation.

. . .

It's a rare individual, indeed, who makes reference to his Fifth Amendment rights, and particularly in such an articulate manner. He was logical. He was certainly coherent. On the basis of that brief contact, he certainly was not floridly psychotic. There was absolutely no indication that he was suffering from any major mental illness.

She also brought up this issue in describing her meetings with Jones at the hospital:

He made it real clear that he believed that we were trampling his rights. I am not quite sure how to say that—that he was not being provided with all of the rights that, under law, he should have. And he explained to us, repeatedly, that's why he chose not to cooperate fully.

However, he did cooperate to a degree. He did take part in a number of interviews and was very polite. At times, stating that he wasn't going to answer certain questions, and he told us why he wasn't going to answer them, because he wanted his own psychiatrist to complete his evaluation first, because at that time he had not yet decided that he was going to use a psychiatric defense.

Jones argues that these references penalized him for his decision to remain silent and constituted a violation of his constitutional rights. He relies on *Wainwright v. Greenfield*, 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634 (1986).

In that case, the police arrested a suspect and repeatedly warned him of his right to remain silent. Each time, the suspect acknowledged that he understood his rights and asked to speak to an attorney. Police officers testified to these facts at trial. In closing argument, the prosecutor suggested that the defendant's repeated demands to consult with an attorney before talking with the police was evidence inconsistent with his claim of insanity. *Wainwright v. Greenfield, supra* at 286–87. The Court held that it is "fundamentally unfair" for the State to promise a defendant that his silence will not be used against him, and then to turn around and use his silence as evidence of his sanity. The Court stated that the prosecutor's argument improperly penalized the defendant for asserting his constitutional rights and therefore violated due process. Jones argues that Dr. Mayers' references to his Fifth Amendment statements similarly rendered his own trial "fundamentally unfair".

Again, Jones' argument overlooks one important fact. Dr. Mayers was not the first witness to comment on Jones' Fifth Amendment statements. The defendant's own expert witness, Dr. Lindsay, twice referred to these same facts on direct examination. First, in response to a question as to what information he based his diagnosis of Jones on, he stated that:

> In reviewing the reports from Western State Hospital, it was difficult to assess, because he pled the Fifth Amendment, and so they were left with simply observing him, rather than having the privilege of really interviewing and examining him in the manner which I had the opportunity to do.

Second, in response to a question about what Jones had told him in one of his examinations, Dr. Lindsay stated that "[Jones] described his experience at Western State Hospital in which he pled the Fifth Amendment."

 Dr. Lindsay's comments become important in light of a recent decision from the Supreme Court holding that

although the State is generally not allowed to comment on a defendant's choice to remain silent, it can do so in rebuttal if the defense "opens the door" to that issue. In *United States v. Robinson,* ___ U.S. ___, 99 L. Ed. 2d 23, 108 S. Ct. 864 (1988), defense counsel stated in closing argument to the jury that the government had unfairly denied defendant the opportunity to explain his actions. The trial court concluded that the defense had "opened the door" to comment on the defendant's failure to testify at trial, and allowed the prosecutor to argue that the defendant had had opportunity to explain his actions through testifying at trial as well as at earlier stages of the investigation. The Court affirmed this ruling, concluding that there is no violation of the privilege against self–incrimination when "the prosecutor's reference . . . is a fair response to a claim made by defendant or his counsel . . ." *Robinson,* 108 S. Ct. at 869.

Dr. Mayers' testimony was a "fair response" to an argument made by the defense. Dr. Lindsay first referred to Jones' Fifth Amendment statements by arguing that his evaluation of Jones was more authoritative than the hospital's, Jones having fully cooperated with him but not with the hospital staff. This argument "opened the door" for the State's psychologist to respond by detailing the ways in which she was able to evaluate Jones' sanity even though he had refused to cooperate fully in her examination. From the comments made by Dr. Lindsay, the jury could assume that Jones had said *nothing* to the hospital staff, thereby undermining the credibility of Dr. Mayers' evaluation. In order to counter this impression, Dr. Mayers had to reveal that they had indeed discussed certain topics, one of which was how and why Jones was exercising his Fifth Amendment rights.

Dr. Mayers' references to Jones' Fifth Amendment statements constituted proper rebuttal testimony, the defense having "opened the door" to this issue through Dr. Lindsay's testimony.

Jones' conviction is affirmed.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.