[No. 59436-8. En Banc. August 12, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH M. OLIVAS, ET AL, *Appellants*.

74

*Paul J. Wasson,* for appellants (appointed counsel for appeal).

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Bruce Hanify, Deputy,* for respondent.

SMITH, J. — These are consolidated appeals challenging orders of the Yakima County Superior Court authorizing the State to perform DNA blood tests on Appellants pursuant to RCW 43.43.754. The Court of Appeals, Division Three, certified the cases to this court pursuant to RCW 2.06.030. We accepted certification on August 7, 1992. We affirm the orders of the trial court.

## STATEMENT OF FACTS

Each of the seven appellants (Joseph M. Olivas, Norman M. Skyles, Jorge V. Gallardo, Robert Ayala, Arnoldo A. Alcaraz, Alejandro L. Cruz and Michael C. Briggs) (Appellants) entered pleas of "guilty" to the crimes charged or to reduced charges. In each case a blood sample was ordered for deoxyribonucleic acid (DNA) identification purposes pursuant to RCW 43.43.754.[1] The record in each case contains no indication that blood or semen was passed during commission of the crimes, although in some cases their presence could be inferred. The record does not indicate whether Appellants were informed that a consequence of their guilty pleas was extraction of blood for DNA identification purposes.

### State v. Joseph M. Olivas

Appellant Joseph M. Olivas was charged with first degree burglary and first degree assault in the Yakima County Superior Court. On April 17, 1991, he pleaded "guilty" to

---

[1] **"DNA identification system — Sex offenders, blood analysis.** After July 1, 1990, every individual convicted in a Washington superior court of a felony defined as a sex offense under RCW 9.94A.030(29)(a) or of a violent offense as defined in RCW 9.94A.030(3[3]) shall have a blood sample drawn for purposes of DNA identification analysis. . . . Any blood sample taken pursuant to RCW 43.43.752 through 43.43.758 shall be used solely for the purpose of providing DNA or other blood grouping tests for identification analysis and prosecution of a sex offense or a violent offense." RCW 43.43.754.

second degree assault and was sentenced to 9 months' incarceration. The burglary count was dismissed. At the hearing the State requested the court to order a blood sample from Appellant Olivas to test for HIV (human immunodeficiency virus) pursuant to RCW 43.43.754 because this was a "violent offense". The Honorable Stephen M. Brown observed that such a blood test was not in order because there had been no physical contact and that it would be a waste of time and taxpayer money to perform the test. Judge Brown also questioned whether the language of the statute reflected the true intent of the Legislature. He indicated that he would not order the HIV blood test in the absence of a sound public policy requiring it.[2]

Nine days later, at a hearing on April 26, 1991, the State asked Judge Brown to order a blood sample from Mr. Olivas for DNA identification analysis pursuant to RCW 43.43.754 because second degree assault was a "violent offense", indicating that at the earlier hearing the parties had mistakenly believed that RCW 43.43.754 mandated HIV testing for this offense instead of DNA testing, and that the court had properly denied an HIV test because this was not a "sex offense". Appellant Olivas' counsel argued that no probable cause existed, that there was no need to gather any additional evidence which might serve to justify this type of warrantless search and that the search would violate Mr. Olivas' constitutional rights. The State countered that following the procedures under the statute was not an unreasonable intrusion because the statute applied only to certain crimes and the procedure was analogous to fingerprinting. Judge Brown noted the constitutional challenge to the statute, but concluded that he would apply the statute as written. He signed an order directing DNA testing, but stayed it pending this appeal.[3]

---

[2]State v. Olivas Plea and Sentence, at 6-10 (Apr. 17, 1991); Clerk's Papers, at 3-11, 17-21. The State's reference to HIV was clearly in error. It has no relevance to these cases.

[3]State v. Olivas Verbatim Report of Proceedings (Apr. 26, 1991); Clerk's Papers, at 15-16.

## State v. Norman M. Skyles

On January 2, 1991, Appellant Norman M. Skyles reported to the Selah Police that he believed he had molested his 8-year-old niece. After further investigation, he was charged in the Yakima County Superior Court with child molestation in the first degree.[4]

On March 15, 1991, Appellant Skyles pleaded "guilty" to indecent liberties before the Honorable Susan L. Hahn. On May 28, 1991, he was sentenced to 36 months' incarceration by the Honorable Heather K. Van Nuys. His counsel objected to the State's request for DNA testing as unconstitutional, arguing that there was no probable cause, that it constituted an illegal search, and that it was only being used to accumulate evidence against future uncommitted offenses. Counsel nevertheless stated that he had no objection to HIV testing. Judge Van Nuys observed that there was probable cause to require the test based upon Appellant Skyles' plea of "guilty". She then ordered the test, concluding that the search by DNA testing was no longer illegal. On May 29, 1991, Appellant Skyles filed a notice of appeal from that order.[5]

## State v. Jorge V. Gallardo

Appellant Jorge V. Gallardo was arrested on May 4, 1991, and subsequently charged in the Yakima County Superior Court with second degree assault. On June 27, 1991, he pleaded "guilty" to that charge before Judge Van Nuys and was sentenced to 9 months' incarceration. His counsel objected to the State's request for DNA testing as an unreasonable search and seizure, arguing that there was no probable cause to search for new evidence after the guilty plea, and that such evidence was only being accumulated for future criminal prosecutions. Judge Van Nuys equated DNA testing with mug shots and fingerprints. Appellant Gallar-

---

[4]State v. Skyles Entry of Guilty Plea, at 11; Clerk's Papers, at 17-21, 42.

[5]State v. Skyles Entry of Guilty Plea, at 2, 5-6, 9-10; Verbatim Report of Proceedings, at 8-9; Clerk's Papers, at 5-16, 41. HIV testing is not an issue in this case.

do's counsel distinguished DNA testing as invasive and argued that while blood tests are considered searches under federal law, mug shots and fingerprints are not. Judge Van Nuys concluded that Mr. Gallardo's privacy rights were outweighed by the State's interest in future law enforcement, overruled the objection and ordered DNA testing. On July 2, 1991, Appellant Gallardo filed a notice of appeal from that order.[6]

### State v. Robert Ayala

Appellant Robert Ayala was charged in the Yakima County Superior Court with attempted second degree rape arising out of an incident on March 24, 1991. On May 5, 1991, he pleaded "guilty" to that charge before Judge Pro Tempore Michael E. Schwab. On June 13, 1991, Mr. Ayala was sentenced to 36 months' incarceration by the Honorable Susan L. Hahn. She entered findings of fact and conclusions of law to justify an exceptional sentence below the standard range and ordered DNA testing. She found that there was no actual sexual contact between Mr. Ayala and the victim. Mr. Ayala's counsel objected to DNA testing as an unreasonable search, declaring that there was no probable cause to accumulate evidence for future uncommitted crimes, that blood samples are quite distinct from fingerprints and photographs, that DNA testing is not accepted nationwide as meeting the *Frye* test, and that a high rate of recidivism does not justify unreasonable searches. Judge Hahn acknowledged a distinction between fingerprints and DNA for identification, but concluded that the statute mandates DNA testing. She ordered the test. On June 25, 1991, Appellant Ayala filed a notice of appeal from that order.[7]

### State v. Arnoldo A. Alcaraz

Appellant Arnoldo A. Alcaraz was charged in the Yakima County Superior Court with first degree assault arising out

---

[6]State v. Gallardo Verbatim Report of Proceedings, at 2-4, 10-12; Clerk's Papers, at 2-8.

[7]State v. Ayala Plea of Guilty, at 7-8 (May 5, 1991); Sentencing Proceeding, at 6-9; Clerk's Papers, at 5-19.

of an incident on March 26, 1991. On June 13, 1991, before Judge Hahn, he pleaded "guilty" to first degree assault and was sentenced to 3 months' incarceration. His counsel objected to the State's request for DNA testing, arguing that the court had already heard argument on the matter. Judge Hahn agreed, stating "I will incorporate your argument in the *Ayala* case by reference." She also incorporated her own and the State's responses in that case. She ordered DNA testing. On June 25, 1991, Appellant Alcaraz filed a notice of appeal from that order.[8]

### State v. Alejandro L. Cruz

Appellant Alejandro L. Cruz, age 18, was charged in the Yakima County Superior Court with second degree rape of a child arising out of an act of sexual intercourse with his 13-year-old girlfriend on June 6, 1991. On July 10, 1991, before Judge Van Nuys, he pleaded "guilty" to second degree child molestation and was sentenced to 15 months' incarceration. His counsel objected to the State's proposed order for DNA testing, asking the court to "incorporate our previous argument by reference to save time." Judge Van Nuys noted the objection, considered the prior arguments, ruled the statute constitutional and ordered DNA testing. On July 11, 1991, Appellant Cruz filed a notice of appeal from that order.[9]

### State v. Michael C. Briggs

Appellant Michael C. Briggs was charged in the Yakima County Superior Court with first degree assault and first degree robbery arising out of a demand for money from an acquaintance and a stabbing on June 18, 1991. On July 10, 1991, before Judge Van Nuys, he pleaded "guilty" to first degree robbery and was sentenced to 70 months' incarceration. The other count was dismissed. Judge Van Nuys ordered DNA testing over objection of defense counsel. On July 11,

---

[8]State v. Alcaraz Sentencing Proceeding, at 6-14; Clerk's Papers, at 6-19.

[9]State v. Cruz Verbatim Report of Proceedings, at 2-8; Clerk's Papers, at 5-16.

1991, Appellant Briggs filed a notice of appeal from that order.[10]

All the appellants make only one assignment of error: *that in each case the trial court erred by ordering a blood sample for DNA purposes pursuant to RCW 43.43.754.*

QUESTIONS PRESENTED

The questions presented by these consolidated cases are (1) whether the drawing of blood for DNA testing pursuant to RCW 43.43.754 constitutes an unreasonable search and seizure under the state and federal constitutions, (2) whether RCW 43.43.754 violates Appellants' right to due process under both constitutions, (3) whether RCW 43.43.754 violates Appellants' right to equal protection of the laws under both constitutions, and (4) whether Appellants' pleas of "guilty" were knowingly, intelligently and voluntarily made even though they were not told that a consequence of their pleas would be extraction of blood for DNA testing.[11]

DISCUSSION

Constitutional Factors: *State v. Gunwall*[12]

In several recent cases where counsel has not thoroughly briefed and discussed state constitutional grounds indepen-

---

[10]State v. Briggs Verbatim Report of Proceedings, at 2-9; Clerk's Papers, at 4-25.

[11]In enacting legislation relating to DNA identification, the Legislature made the following finding:

"The legislature finds that recent developments in molecular biology and genetics have important applications for forensic science. It has been scientifically established that there is a unique pattern to the chemical structure of the deoxyribonucleic acid (DNA) contained in each cell of the human body. The process for identifying this pattern is called 'DNA identification.'

"The legislature further finds that the accuracy of identification provided by this method is superior to that of any presently existing technique and recognizes the importance of the scientific breakthrough in providing a reliable and accurate tool for the investigation and prosecution of sex offenses as defined . . . [RCW 9.94A.030(29)] and violent offenses as defined . . . [RCW 9.94A.030(33)]." Laws of 1989, ch. 350, § 1.

[12]106 Wn.2d 54, 58-63, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

dently of federal constitutional grounds, this court has declined to consider whether the Washington Constitution protects individual liberties beyond the protection afforded by the United States Constitution.[13] We observed in *State v. Gunwall, supra*, that " 'naked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.' "[14]

Under criteria announced in *Gunwall*, six nonexclusive factors must be briefed before this court will consider an independent state constitutional claim: (1) differences in the textual language of the applicable state and federal provisions; (2) significant differences in the texts of other parallel provisions of the two constitutions; (3) state constitutional and common law history and development; (4) state law preexisting declaration of the federal standard; (5) structural differences between the two constitutions; and (6) matters of state interest or local concern where there is no need for national uniformity.[15]

■ In this case Appellants claim that RCW 43.43.754 violates both the federal and state constitutions. However, they do not address the *Gunwall* factors. While they cite both federal and state constitutional provisions and cases, they do not analyze their separate development or structure. Nor do they explain why this court should make a distinction between federal and state constitutional rights. We therefore decline to consider independent state constitutional grounds.[16]

## Search and Seizure

Appellants claim that each of the blood samples ordered drawn for DNA analysis constitutes an unconstitutional

---

[13]*Foley v. Department of Fisheries*, 119 Wn.2d 783, 788, 837 P.2d 14 (1992); *State v. Boland*, 115 Wn.2d 571, 575-76, 800 P.2d 1112 (1990); *State v. Gunwall*, 106 Wn.2d 54, 58-63, 720 P.2d 808, 76 A.L.R.4th 517 (1986); *In re Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986).

[14]*State v. Gunwall, supra* at 62 (quoting *In re Rosier, supra* at 616).

[15]*State v. Gunwall, supra* at 58-63.

[16]*See State v. Gunwall, supra* at 62.

warrantless search and seizure without probable cause. They argue that the Legislature lacked authority to enact the DNA testing statute, RCW 43.43.754.[17] The State perceives this to be a challenge to both the HIV testing statute, RCW 70.24.340, and the DNA testing statute, RCW 43.43-.754, and defends both under the same analysis.[18]

Appellants argue that the United States Supreme Court has consistently held that requiring a person to provide blood or other bodily fluids to the State constitutes a search and seizure within the scope of the Fourth Amendment. They cite *Schmerber v. California*[19] and *Skinner v. Railway Labor Executives' Ass'n*[20] in support of their assertion that "it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing . . . analysis of the sample to obtain . . . data is a further invasion of the tested [person's] privacy interests."[21] The State acknowledges that nonconsensual blood extraction constitutes a search.[22]

---

[17]"**DNA identification system — Sex offenders, blood analysis.** After July 1, 1990, every individual convicted in a Washington superior court of a felony defined as a sex offense under RCW 9.94A.030(29)(a) or of a violent offense as defined in RCW 9.94A.030(3[3]) shall have a blood sample drawn for purposes of DNA identification analysis. For persons convicted of such offenses after July 1, 1990, who are serving a term of confinement in a county jail or detention facility, the county shall be responsible for obtaining blood samples prior to release from the county jail or detention facility. For persons convicted of such offenses after July 1, 1990, who are serving a term of confinement in a department of corrections facility, the department shall be responsible for obtaining blood samples prior to release from such facility. Any blood sample taken pursuant to RCW 43.43.752 through 43.43.758 shall be used solely for the purpose of providing DNA or other blood grouping tests for identification analysis and prosecution of a sex offense or a violent offense." RCW 43.43.754.

[18]Brief of Respondent, at 6.

[19]384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966).

[20]489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989).

[21]*Skinner*, at 616.

[22]Brief of Respondent, at 11 (citing *Schmerber* and *State v. Curran*, 116 Wn.2d 174, 184, 804 P.2d 558 (1991)).

Appellants claim that under *Schmerber* and *Skinner* the only remaining question in this case is whether the court-ordered searches for DNA pursuant to RCW 43.43.754 are supported by probable cause or individualized suspicion. They argue that because the statute specifically furthers the creation of a DNA data bank for future use and because each of them pleaded "guilty" to their present charges, there thus remains no other crime for which the State could have probable cause or individualized suspicion to justify searching them.[23] Appellants further argue that some other states have required probable cause for extracting a defendant's blood.[24] They also assert that the DNA testing statute, RCW 43.43-.754, violates article 1, section 7 of the Washington Constitution, which generally affords greater protection against warrantless searches and seizures than does the Fourth Amendment.[25] They argue that Washington allows only five "narrow exceptions" to the general requirement for a search warrant: (1) consensual searches; (2) stop-and-frisk searches; (3) hot pursuit; (4) airport and courthouse searches; and (5) border searches,[26] and that RCW 43.43.754 does not come within any of those five exceptions.[27]

Appellants also claim that RCW 43.43.754 does not provide a rational connection between its legislative purpose and the drawing of blood. They acknowledge that if the Legislature had attempted to establish a DNA data bank by use of evidence lawfully collected during investigation of their original charges, they might under that circumstance not then

---

[23]Brief of Appellants, at 9-11.

[24]*People v. Trotman*, 214 Cal. App. 3d 430, 262 Cal. Rptr. 640 (1989); *Commonwealth v. Trigones*, 397 Mass. 633, 492 N.E.2d 1146 (1986); *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988); *Commonwealth v. Danforth*, 395 Pa. Super. 1, 576 A.2d 1013 (1990); *Aliff v. State*, 627 S.W.2d 166 (Tex. Crim. App. 1982).

[25]*State v. Bell*, 108 Wn.2d 193, 196, 737 P.2d 254 (1987); *State v. Myrick*, 102 Wn.2d 506, 510, 688 P.2d 151 (1984). This argument falls short of analysis under the *Gunwall* criteria.

[26]*Jacobsen v. Seattle*, 98 Wn.2d 668, 658 P.2d 653 (1983).

[27]Brief of Appellants, at 11-13.

have any constitutional grounds for objection. They argue, however, that under the statute as it is now written, DNA blood testing after judgment and sentence clearly violates the Washington Constitution because the sole purpose of the test is to accumulate evidence for prospective use in investigating crimes which have not been and may never be committed. They further argue that in the past this court has not permitted "the Legislature to make an 'end run' around the Fourth Amendment"[28] by using evidence obtained pursuant to an unconstitutionally vague "stop-and-identify statute."[29] They argue that they should not be "stripped of constitutional protections [simply because] [they are] imprisoned for crime."[30] They also argue that prisoners retain a constitutional expectation that their bodily integrity will be maintained and that RCW 43.43.754 is unconstitutional because it violates this expectation.[31]

The State claims that mandatory blood tests are constitutional searches, arguing that the Legislature found that a DNA bank would be a "reliable and accurate tool for the investigation and prosecution of sex offenses . . . and violent offenses".[32]

The State also claims that the DNA statute is a lawful exercise of the police power. It further argues that the statutory scheme is reasonably necessary for protection of the public health, safety, morals and general welfare because DNA testing is aimed at preventing and detecting crime; the statute is narrowly drawn and is substantially related to the evil sought to be cured; and the class of persons sought to be regulated — those convicted of violent offenses and sex offenses — is reasonably related to the legitimate object of the legisla-

---

[28]*State v. White*, 97 Wn.2d 92, 106-07, 640 P.2d 1061 (1982).

[29]RCW 9A.76.020(1), (2).

[30]*State v. Hartzog*, 96 Wn.2d 383, 391, 635 P.2d 694 (1981) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555-56, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974)).

[31]Brief of Appellants, at 13-14.

[32]Laws of 1989, ch. 350, § 1.

tion.[33] The State also argues that the United States Supreme Court has concluded that testing of blood and urine for drug and alcohol content is constitutional where there is a compelling state interest[34] or " 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."[35]

The State further argues that nonconsensual extractions of blood to test alcohol content were allowed in *Schmerber v. California*[36] and *State v. Curran*[37] as a permissible exception to the warrant requirement and as "a reasonable test performed in a reasonable manner."[38] It argues that there is only one probable cause requirement for any such search and that the probable cause requirement in this case was satisfied when the arrest was made.[39] It claims that, therefore, "the voluntariness of [the defendant's] consent is constitutionally irrelevant",[40] and speculates that the "surprising absence" of cases regarding postconviction blood extractions is due to the fact that there is no constitutional jeopardy at this stage of the proceedings. The State cites a treatise to support its claim that collection of nontestimonial evidence such as photographs, fingerprints, voice identification, and blood samples does not implicate the right to counsel or the right against self-incrimination and should not be

---

[33]*See Petstel, Inc. v. County of King*, 77 Wn.2d 144, 459 P.2d 937 (1969), for the constitutional test.

[34]*National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (1989).

[35]Brief of Respondent, at 8-10 (quoting *Skinner*, at 620).

[36]384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966).

[37]116 Wn.2d 174, 804 P.2d 558 (1991).

[38]*Curran*, at 184 (citing *State v. Judge*, 100 Wn.2d 706, 711-12, 675 P.2d 219 (1984)); *State v. Wetherell*, 82 Wn.2d 865, 514 P.2d 1069 (1973); *Breithaupt v. Abram*, 352 U.S. 432, 1 L. Ed. 2d 448, 77 S. Ct. 408 (1957); *State v. Meacham*, 93 Wn.2d 735, 612 P.2d 795 (1980).

[39]*Schmerber*, at 768-69; *Wetherell*, at 869-70.

[40]*State v. Rogers*, 37 Wn. App. 728, 732 n.2, 683 P.2d 608 (1984).

excluded under the Fourth Amendment unless the person is being detained illegally.[41] The State also cites several cases which conclude that the Fourth, Fifth, and Sixth Amendments are not implicated by collection of nontestimonial evidence.[42] The State also argues that this court's approval of a warrantless collection of urine from prospective employees at a nuclear facility repudiates Appellants' argument that a search related to "future conduct" is unreasonable because prospective employees could not have already committed an act which would give probable cause for a search.[43] Finally, the State purports to incorporate by reference the privacy discussion by the United States District Court in *Jones v. Murray.*[44]

Neither Appellants nor the State has adequately addressed the search and seizure issue as it has developed in the cases. Appellants and respondent agree that nonconsensual extractions of blood constitute searches under the Fourth and Fourteenth Amendments, citing *Schmerber* and *Skinner.* Those cases concluded that the searches were not unconstitutional even though they were conducted without warrants.

The Court reasoned in *Schmerber v. California*[45] that there was sufficient probable cause to draw a blood sample from a person who was hospitalized immediately after an automobile collision and who evidenced the odor from ingestion of alcohol, and that the warrant requirement was excused because alcohol dissipates from the body and, under the cir-

---

[41]2 J. Cook, *Constitutional Rights of the Accused* 208, 259 (2d ed. 1986).

[42]*State v. Schulze*, 116 Wn.2d 154, 161, 804 P.2d 566 (1991); *Bellevue v. Olson*, 60 Wn. App. 485, 803 P.2d 1346 (1991); *State v. Johnson*, 7 Wn. App. 445, 449, 500 P.2d 1272 (1972); *State v. Nuss*, 52 Wn. App. 735, 741-42, 763 P.2d 1249, *review denied*, 112 Wn.2d 1010 (1988); *State v. Jones*, 49 Wn. App. 398, 405, 743 P.2d 276 (1987), *aff'd,* 111 Wn.2d 239, 759 P.2d 1183 (1988).

[43]*Alverado v. WPPSS*, 111 Wn.2d 424, 440-41, 759 P.2d 427 (1988), *cert. denied*, 490 U.S. 1004 (1989).

[44]Brief of Respondent, at 11-14; *Jones v. Murray*, 763 F. Supp. 842 (W.D. Va. 1991), *aff'd in part, rev'd in part*, 962 F.2d 302 (4th Cir.), *cert. denied*, ___ U.S. ___, 121 L. Ed. 2d 378, 113 S. Ct. 472 (1992).

[45]384 U.S. 757, 771, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966).

cumstances, "there was no time to seek out a magistrate and secure a warrant."

The State confuses the warrant requirement with the probable cause requirement when it asserts that the probable cause requirement was excused because the Court in *Schmerber* excused the warrant requirement. Contrary to that contention, the Court actually concluded that there was probable cause for the arrest, allowed the search as "an appropriate incident to petitioner's arrest", and excused the warrant requirement.[46]

The State also cites *Schmerber* for the proposition that the extraction of blood was "an appropriate incident to petitioner's arrest."[47] It argues alternatively that probable cause was satisfied in this case because Appellants had already been arrested and the DNA testing was somehow "incident" to those arrests even though the blood samples were drawn months after the arrests. However, the State fails to note that in *Schmerber* the search was allowed without a warrant because there was probable cause to believe that evidence gathered in the search would aid in prosecuting the same crime for which probable cause existed in the first place. The blood samples from the searches in the cases now before us were not used to prevent or deter alcohol use by drivers nor to prosecute future uncommitted crimes. They were used solely for DNA identification of offenders after conviction and would not be considered "incident to arrest" under *Schmerber*.

 In *Skinner v. Railway Labor Executives' Ass'n*[48] the Court reasoned that when nonconsensual extractions of blood are performed without a warrant or individualized suspicion, the State must have " 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." In that case, the war-

---

[46]*Schmerber*, at 770-71.

[47]*Schmerber*, at 771.

[48]489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989).

rantless collection of blood, breath and urine of railroad employees for drug and alcohol testing was held constitutional under a "special needs beyond normal law enforcement" analysis. The Court stated that the regulation requiring the testing was enacted "not to assist in the prosecution of employees, but rather [to further the government's 'special need'] 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.' "[49]

Once the Court in *Skinner* found a "special need beyond normal law enforcement" for the blood testing, it concluded that the purpose of a warrant requirement is to protect privacy interests by assuring the person subject to a search that it is not a random or arbitrary act of government, that the intrusion is authorized by law and is narrowly limited, and that it provides a detached, neutral and objective determination by a magistrate that the intrusion is justified. The Court then declared that to require a warrant in that case would not further the traditional purposes of a warrant because of the standardized nature of the testing and the lack of facts for evaluation by a magistrate. The Court also cited *Schmerber*, stating that because drugs and alcohol dissipate from the body, requiring a warrant would frustrate the government's interest in the search. The Court also noted the government's reliance on private railroad companies to administer the tests as another reason for dispensing with a warrant.[50]

While a warrant, probable cause and individualized suspicion were not required, the Court in *Skinner* did require "special needs beyond normal law enforcement", a showing that the search and testing was reasonable and a showing that a warrant would be impractical and would frustrate the government's interest. Emphasis was placed on the urgency of action immediately following a train accident. Neither

---

[49]*Skinner*, at 620-21.

[50]*Skinner*, at 621-24.

Appellants nor the State addresses this "special needs" requirement. The State merely argues that the government has a compelling interest in DNA testing under the statute.

The State also cites *National Treasury Employees Union v. Von Raab.*[51] Appellants do not cite it. In that case the Court allowed the government to test for drug use, without warrants or individualized suspicion, urine specimens of employees of the customs service. The Court cited the balancing factors in *Skinner* which weigh the privacy interests of persons subject to a search against the "special needs beyond normal law enforcement" of the government. The Court acknowledged the compelling interest of the government in deterring drug use among armed law enforcement officers who have responsibility for confiscating illegal drugs. The Court noted that the searches were not designed to serve the ordinary needs of law enforcement because, under the challenged statute, test results would not be used to prosecute employees; but instead the results would be used only to deter drug use among those eligible for promotion and to prevent promotion of employees who use drugs. The Court analyzed the goals and practicality of a warrant requirement and concluded that probable cause or individualized suspicion would not further those goals and would frustrate the government's efforts to deter drug use in the Customs Service. The Court also emphasized that Customs employees, as well as the railroad employees in *Skinner,* were aware that certain jobs required such testing.[52] The Court required a compelling governmental interest which entailed a "special need beyond normal law enforcement" before dispensing with the warrant requirement.

None of those cases squarely applies to the facts in this case. In this case, the DNA blood tests are required after conviction. In *Skinner* and *Von Raab* the blood and urine tests were of persons who had not been charged with any offense. In this case, the statutory purpose of DNA testing is

---

[51]489 U.S. 656, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (1989).

[52]*Von Raab,* at 665-72.

explicitly for future identification and prosecution. The Court in *Skinner* and *Von Raab* clearly stated that the test results would not be used for prosecution, but only for deterrence of drug use.

The State claims that DNA testing is substantially similar to HIV testing and cites *State v. Farmer*[53] for the proposition that compulsory testing "must be supported by a legitimate, compelling state interest" unless one of the statutory exceptions applies.[54] The State incorrectly relies on *Farmer* because that case considered the First Amendment right to privacy which is not involved here. Under the Fourth Amendment search and seizure analysis, a reasonable expectation of privacy is considered.

The State also purports to incorporate by reference the entire privacy discussion in *Jones v. Murray*[55] without further comment. *Jones v. Murray, supra,* is a 42 U.S.C. § 1983 challenge to a Virginia statute which requires DNA testing of all convicted felons. The United States Court of Appeals for the Fourth Circuit partially upheld the decision of the United States District Court for the Western District of Virginia which granted summary judgment to the State of Virginia, concluding that the statute is constitutional. The case was remanded on an ex post facto issue not argued by Appellants in this case.

*Jones v. Murray, supra,* is factually similar to this case. The relevant distinctions are that (1) the Washington statute only requires DNA testing of convicted sex offenders and violent offenders, while the Virginia statute requires DNA testing of all felons; and (2) in this case, all the Appellants were arrested and convicted after the effective date of the statute, while in *Jones v. Murray, supra,* some prisoners had ex post facto claims.

---

[53]116 Wn.2d 414, 430, 805 P.2d 200, 812 P.2d 858 (1991).

[54]Brief of Respondent, at 8 (citing *State v. Farmer, supra* at 430).

[55]763 F. Supp. 842 (W.D. Va. 1991); *aff'd in part, rev'd in part,* 962 F.2d 302 (4th Cir.), *cert. denied,* ___ U.S. ___, 121 L. Ed. 2d 378, 113 S. Ct. 472 (1992).

*Jones v. Murray, supra,* is persuasive authority for the proposition that drawing of blood from convicted felons to establish a DNA data bank for use in future prosecution of recidivist acts does not violate the Fourth Amendment. The opinion of the District Court extended the "special needs" analysis to law enforcement, emphasizing that establishing a DNA data bank will be a deterrent to recidivist acts and therefore its purpose is not for "normal" law enforcement. The court cited two studies presented by the State of Virginia which conclude (1) that approximately 62.5 percent of all felons studied were arrested for a felony or serious misdemeanor within 3 years of release and approximately 22.7 percent were arrested for a violent offense within 3 years of release and (2) that some DNA will be left at the scene by the perpetrator in approximately 30 percent of all violent crimes. The court concluded, therefore, that a DNA data bank would be a significant deterrent against recidivist activity.[56] The Court of Appeals opinion declined to address the "special needs" analysis.[57] Instead it referred to the limited privacy rights of convicted persons, citing the constitutionality of warrantless searches of the jail cells and the body cavities of prisoners, and the residences, belongings and persons of probationers. The court observed that DNA identification is tantamount to fingerprinting and photographing and that the limited right of privacy does not protect the identity of a convicted person. The court declared that the government had a law enforcement interest in knowing the identity of persons who commit crimes. It weighed the interest of the government against the limited privacy rights of convicted felons and the minor intrusion of a blood test and concluded that the DNA statute did not violate the Fourth Amendment.[58]

On the one hand, the United States Court of Appeals opinion in *Jones v. Murray, supra,* did not use the "special needs"

---

[56]*Jones v. Murray, supra* at 844-49.

[57]962 F.2d at 306-07 & n.2.

[58]962 F.2d at 305-08.

analysis to conclude that a state interest in law enforcement will justify drawing blood from convicted persons without probable cause or individualized suspicion.[59] That opinion did not require the government to have a need "beyond normal law enforcement", but in not requiring it, the court diminished the privacy rights of convicted persons. On the other hand, the opinions of the District Court in *Jones v. Murray, supra,* and of the United States Supreme Court in *Skinner* and *Von Raab* allowed warrantless searches, but affirmed general privacy rights by requiring "special needs beyond normal law enforcement" for drawing blood from convicted persons without probable cause or individualized suspicion. We find this a better reasoned approach.

### Due Process

■ The State argues that the due process issue has been resolved in *Breithaupt v. Abram.*[60] In that case the United States Supreme Court concluded that "a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' nor such a method of obtaining evidence that it offends a 'sense of justice'."[61] Those were the reasons the Court cited in *Rochin v. California,* 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R.2d 1396 (1952) for concluding that stomach pumping without a warrant to obtain evidence violated due process.[62] Under this due process analysis, the State is correct in asserting that Appellants must show that the *procedure* used in drawing their blood was unconstitutional and not, as Appellants claim, that the *purpose* for which their blood was drawn was unconstitutional.

■ Appellants claim that the DNA testing statute, RCW 43.43.754, is unconstitutionally vague on its face under due

---

[59]962 F.2d at 307.

[60]352 U.S. 432, 1 L. Ed. 2d 448, 77 S. Ct. 408 (1957).

[61](Citations omitted.) *Breithaupt,* at 437 (quoting *Rochin v. California,* 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R.2d 1396 (1952); *Brown v. Mississippi,* 297 U.S. 278, 285-86, 80 L. Ed. 682, 56 S. Ct. 461 (1936)).

[62]*Breithaupt v. Abram, supra.*

process analysis. They acknowledge that they have the burden of persuasion and that a statute will not be declared unconstitutionally vague unless it appears unconstitutional beyond a reasonable doubt.[63] But under *Spokane. v. Douglass,* 115 Wn.2d 171, 795 P.2d 693 (1990), "[v]agueness challenges to enactments which do not involve First Amendment rights are to be evaluated in light of the particular facts of each case." Such enactments are not properly evaluated for facial vagueness, but rather as they were applied.[64] Appellants' claims do not involve First Amendment rights. They have not established that the DNA testing statute is unconstitutionally vague beyond a reasonable doubt.

### Equal Protection

Appellants claim that RCW 43.43.754 violates their constitutional right to equal protection of the laws. They cite *State v. Phelan,*[65] stating that in equal protection analysis one of three recognized tests is used: (1) rational relationship, (2) strict scrutiny, or (3) intermediate scrutiny. They argue that drawing blood impinges on the "fundamental right" of all persons to be free from unlawful intrusion by the State and, therefore, either "strict scrutiny" or "intermediate scrutiny" must be applied to the DNA statute.[66]

■ ■ Our first inquiry when an equal protection challenge is made is to identify the appropriate standard of judicial scrutiny.[67] We then consider whether the statutory clas-

---

[63]*Spokane v. Douglass,* 115 Wn.2d 171, 795 P.2d 693 (1990); *State v. Maciolek,* 101 Wn.2d 259, 676 P.2d 996 (1984); *State v. Rhodes,* 92 Wn.2d 755, 600 P.2d 1264 (1979).

[64]*Spokane v. Douglass, supra* at 182.

[65]100 Wn.2d 508, 671 P.2d 1212 (1983).

[66]Brief of Appellants, at 17-20.

[67]*E.g., Paulson v. County of Pierce,* 99 Wn.2d 645, 652, 664 P.2d 1202 ("[a]t the outset of any equal protection analysis, we must identify the appropriate standard of judicial scrutiny"), *appeal dismissed,* 464 U.S. 957 (1983); *Forbes v. Seattle,* 113 Wn.2d 929, 940, 785 P.2d 431 (1990) ("[w]e begin by identifying the appropriate standard of judicial scrutiny").

sification is valid under the appropriate level of scrutiny.[68] In *State v. Coria*[69] we held that a statutory classification which implicates a liberty interest is not subject to the intermediate level of scrutiny unless the classification also affects a semisuspect class. No liberty interest is involved in this case, nor is a suspect or semisuspect class involved. Freedom from a blood test is not a fundamental right.[70] Therefore, the rational basis test applies in this case.

■■ "Equal protection of the laws under state and federal constitutions requires that persons similarly situated with respect to the legitimate purpose of the law receive like treatment."[71] The DNA testing statute only applies to persons who have committed "sex offenses" or "violent offenses". The purpose of the statute is to investigate and prosecute sex offenses and violent offenses.[72] There is a rational relationship between the interest of the government in law enforcement and the application of the statute to this class of persons.

### Knowing, Intelligent and Voluntary Pleas

Appellants claim that they were not informed that a direct and immediate consequence of their pleas of "guilty" was that they must submit to DNA testing and that the evidence would be used against them in some future prosecution. They argue that it is a violation of due process to accept a plea of "guilty" without an affirmative showing that the plea

---

[68]*See, e.g., State v. Coria*, 120 Wn.2d 156, 169-71, 839 P.2d 890 (1992); *American Network, Inc. v. Utilities & Transp. Comm'n*, 113 Wn.2d 59, 78, 776 P.2d 950 (1989); *State v. Schaaf*, 109 Wn.2d 1, 18, 743 P.2d 240 (1987).

[69]120 Wn.2d 156, 171, 839 P.2d 890 (1992).

[70]*Schmerber*, 384 U.S. at 771; *Skinner*, 489 U.S. at 625; *Jones v. Murray*, 962 F.2d at 305; *Jones v. Murray*, 763 F. Supp. at 847; *State v. Meacham*, 93 Wn.2d 735, 737-39, 612 P.2d 795 (1980); *In re A,B,C,D,E*, 121 Wn.2d 80, 92, 847 P.2d 455 (1993).

[71]*Harmon v. McNutt*, 91 Wn.2d 126, 130, 587 P.2d 537 (1978).

[72]RCW 43.43.754; Finding, Laws of 1989, ch. 350, § 1.

was made knowingly, intelligently and voluntarily.[73] The State claims that if a constitutional error occurred, it was harmless and was not prejudicial because the remedy would have been to formalize notice of the test procedure.[74]

Appellants argue that because the procedure is a search and because the evidence will be used in future prosecutions, it is a direct, and not a collateral, consequence of their pleas.[75] They quote the test for distinguishing between direct and collateral consequences of pleas: the distinction "turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment".[76]

▆▆ The DNA statute mandates testing for all persons who fall within its purview. Its application is automatic. However, Appellants do not argue that they are being punished by the procedure itself. They confuse the procedure with the possible future consequences to them from use of evidence obtained from the testing. Possible future punishment is not a definite or immediate consequence of the testing.

Finally, Appellants cite revised CrR 4.2(g),[77] which now provides that an accused person must be informed that a consequence of a plea of "guilty" for a sex offense or a violent

---

[73]*Boykin v. Alabama*, 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969); *State v. Barton*, 93 Wn.2d 301, 304, 609 P.2d 1353 (1980); CrR 4.2(d) which provides:

"**Voluntariness.** The court shall not accept a plea of guilty, without first determining that it is made voluntarily, competently and with an understanding of the nature of the charge and the consequences of the plea. The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea."

[74]Brief of Respondent, at 20 (citing *State v. Falling*, 50 Wn. App. 47, 747 P.2d 1119 (1987)).

[75]Brief of Appellants, at 20-22.

[76]*State v. Barton, supra* at 305 (quoting *Cuthrell v. Director*, 475 F.2d 1364, 1366 (4th Cir. 1973)).

[77]"**Written Statement.** A written statement of the defendant in substantially the form set forth below shall be filed on a plea of guilty:

offense is DNA testing. They argue that they were not so informed.[78] CrR 4.2(g) statement para. (6)(o) does not apply to Appellants because they entered their pleas of "guilty" prior to its effective date of September 1, 1991.

Where there is a claim of involuntariness of a plea, a procedure suggested by *State v. Osborne*[79] as a solution under CrR 4.2(f) is for the court to allow withdrawal of the plea "whenever it appears that the withdrawal is necessary to correct a manifest injustice." None of Appellants have attempted to withdraw their pleas of "guilty" nor have they claimed that withdrawing their pleas is necessary to correct a manifest injustice.

The State is correct in its assertion that the fact that Appellants were not told that DNA testing would be required as part of their sentences does not make their otherwise knowing, intelligent and voluntary pleas void for violation of due process.[80]

SUMMARY AND CONCLUSION

The drawing of blood without a search warrant, probable cause or individualized suspicion has been allowed by federal and state cases. However, there are two distinct logical routes used by those courts to arrive at that conclusion. One route is to balance the limited privacy rights of convicted persons against a compelling governmental interest. The other route is to balance the general privacy right of persons to be free from unjustified governmental intrusion against

---

"....

"6. IN CONSIDERING THE CONSEQUENCES OF MY GUILTY PLEA, I UNDERSTAND THAT:

"....

"(o) If this crime involves a sex offense or a violent offense, I will be required to provide a sample of my blood for purposes of DNA identification analysis. [If not applicable, this paragraph should be stricken and initialed by the defendant and the judge.]" CrR 4.2(g).

[78]Brief of Appellants, at 22-25.

[79]102 Wn.2d 87, 96, 684 P.2d 683 (1984) (quoting CrR 4.2(f).

[80]*State v. Barton, supra* at 305.

the "special needs beyond normal law enforcement" of the government. We conclude that the latter is the better reasoned approach.

In *Breithaupt v. Abram, supra,* the United States Supreme Court concluded that the procedure used to draw blood is so routine that it does not violate due process when properly conducted.[81] Appellants do not claim that the procedures used in these cases were improperly conducted.

In *Spokane v. Douglass, supra,* this court concluded that a statute may be challenged facially only where there is a First Amendment right at issue, and that in all other circumstances only the application of the statute may be challenged.[82] Appellants do not have a First Amendment claim. Their facial attack upon the DNA statute is not well made.

The DNA statute requires application only of the "rational relationship" test because no liberty interest, suspect or semi-suspect class, or fundamental right is involved in this case. Under equal protection analysis, there is a rational relationship between the DNA testing statute and law enforcement.

Appellants' pleas were knowingly, intelligently and voluntarily made despite the fact that they were not informed of required DNA testing prior to entering their pleas. Such a requirement is only a collateral consequence of their pleas.[83] They may not claim the benefit of CrR 4.2(g) because it became effective after they entered their pleas.[84]

We conclude that the DNA statute, RCW 43.43.754, is constitutional as applied to the facts in the cases of Appellants Joseph M. Olivas, Norman M. Skyles, Jorge V. Gallardo, Robert Ayala, Arnoldo A. Alcaraz, Alejandro L. Cruz and Michael C. Briggs.

---

[81] 352 U.S. at 436.

[82] 115 Wn.2d at 181-83.

[83] *State v. Barton,* 93 Wn.2d 301, 305, 609 P.2d 1353 (1980).

[84] 116 Wn.2d 1101 (1991).

We therefore affirm the orders of the trial court directing DNA testing in each of these seven cases.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, DURHAM, and GUY, JJ., concur.

UTTER, J. (concurring) — While I concur in the judgment issued today, I write separately to express my understanding of the appropriate grounds for upholding nonconsensual DNA (deoxyribonucleic acid) testing under RCW 43.43.754 against Fourth Amendment challenge. In my view, the "special needs" analysis relied upon by the majority was not designed for application to searches and seizures in the context of ordinary law enforcement. Instead, the nonconsensual DNA testing scheme should be analyzed and upheld under traditional doctrines of criminal Fourth Amendment law.[85]

I

The fourth amendment to the United States Constitution guarantees that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. 4. Not all searches and seizures are prohibited by the Fourth Amendment, only those which are "unreasonable". *United States v. Sharpe*, 470 U.S. 675, 682, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985). In general, the

---

[85]In addition to their Fourth Amendment argument, appellants have also raised an argument under article 1, section 7 of the Washington State Constitution. The majority has correctly determined that appellants' claims under article 1, section 7 need not be addressed for failure to meet the requirements of *State v. Gunwall*, 106 Wn.2d 54, 58-63, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Majority, at 81-82. I therefore do not discuss the relationship of the decision in these cases to my concurring opinion in *State v. Curran*, 116 Wn.2d 174, 189, 804 P.2d 558 (1991) (Utter, J., concurring).

question of whether a particular search is "reasonable" is answered by determining whether the search was made pursuant to a warrant supported by probable cause. *See United States v. Place*, 462 U.S. 696, 701, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). "Except in certain well-defined circumstances, a search or seizure . . . is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989) (citing *Payton v. New York*, 445 U.S. 573, 586, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980)).

Over the past few years, however, the United States Supreme Court has recognized the existence of " 'special needs, beyond the normal need for law enforcement, [which] make the warrant and probable-cause requirement impracticable.' " *Griffin v. Wisconsin*, 483 U.S. 868, 873, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (1987) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985) (Blackmun, J., concurring)). When such "special needs" exist, a reviewing court must "balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Railway Labor Executives' Ass'n*, 489 U.S. at 619.

Employing "special needs" analysis, the Court has upheld warrantless and even suspicionless administrative searches in a variety of contexts. *See, e.g., New Jersey v. T.L.O., supra* (upholding school principal's search of student's handbag without probable cause); *Griffin v. Wisconsin, supra* (upholding warrantless search of probationer's home by probation officer); *O'Connor v. Ortega*, 480 U.S. 709, 94 L. Ed. 2d 714, 107 S. Ct. 1492 (1987) (upholding hospital's warrantless search of doctor's workspace).

The precise application of "special needs" balancing has still not been fully elaborated by the Supreme Court. It seems to be unclear, for example, whether courts employing "special needs" are to balance the government's need to conduct a given search against an individual's privacy interest, or instead to balance the government's need to conduct the

search *without a warrant* against an individual's privacy interests.[86]

One facet of "special needs" balancing which *is* clear is that it is not intended to be applied where the government's interest is limited to the normal need for law enforcement. The "special needs" test, as originally formulated by Justice Blackmun in *T.L.O.*, 469 U.S. at 351, and as applied by the Court's decisions, indicates that "special needs" balancing is only relevant where the government's needs are *not* those associated with the "normal need for law enforcement". *See, e.g., Railway Labor Executives' Ass'n*, 489 U.S. at 620-21 (drug testing upheld under "special needs" where purpose was not "the prosecution of employees, but rather 'to prevent accidents and casualties in railroad operations . . ..' ") (quoting 49 C.F.R. § 219.1(a)); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 666, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (1989) ("special needs" applied to drug testing by customs service, in part because test results could not be employed in criminal prosecutions).

Because "special needs" is only relevant where the State's need is beyond that of ordinary law enforcement, it is not applicable to these cases. The State's interest in nonconsensual DNA testing of convicted sex and violent offenders is clearly related to the normal need for law enforcement. The purpose of the testing is to create a DNA databank, and the purpose of the databank is to assist in the investigation and prosecution of criminal offenses.

> The legislature further finds that the accuracy of identification provided by this method is superior to that of any presently existing technique and recognizes the importance of this scientific breakthrough in providing a reliable and accurate tool for the investigation . . . of sex offenses . . . and violent offenses . . ..

Laws of 1989, ch. 350, § 1, p. 1748. *See also* Laws of 1989, ch. 350, § 2, p. 1748 (DNA identification system established

---

[86]The government's interest in searching without a warrant is necessarily much narrower than its need to engage in the search itself. The difference between these two interests was dramatically displayed in this court's split decision in *In re A,B,C,D,E*, 121 Wn.2d 80, 847 P.2d 455 (1993).

to "support criminal justice services") (codified at RCW 43.43.752). These purposes, the investigation of crimes and the support of criminal justice services, are the quintessence of law enforcement.

I recognize that a Federal District Court in Virginia has applied "special needs" balancing to uphold a DNA testing scheme similar to RCW 43.43.754. *Jones v. Murray*, 763 F. Supp. 842 (W.D. Va. 1991), *aff'd in part, rev'd in part*, 962 F.2d 302 (4th Cir.), *cert. denied*, ___ U.S. ___, 121 L. Ed. 2d 378, 113 S. Ct. 472 (1992).[87] That court concluded that the establishment of a DNA databank was not a "normal" law enforcement need, but rather a *"special"* law enforcement need. 763 F. Supp. at 845. The court relied principally on *Griffin v. Wisconsin, supra*, where the Supreme Court employed "special needs" to uphold a warrantless search of the home of a probationer for evidence of probation violations. 763 F. Supp. at 845. In *Griffin*, however, the Court made clear that the key element of the probation program which triggered "special needs" balancing was not its tangential relationship to law enforcement. Instead, administering a probation program was roughly analogous to operating a prison or school, where the "special needs" of the government in effective administration have been well recognized. 483 U.S. at 873. Wisconsin's interest was not law enforcement per se, but rather ensuring that its probation system operated smoothly. *Griffin* therefore does not support the application of "special needs" where, as here, the State is pursuing the normal law enforcement need for discovering and prosecuting criminal activity.

## II

Since "special needs" should not apply, the DNA testing scheme adopted by the State must be analyzed under traditional principles of Fourth Amendment law. Under these prin-

---

[87]The chief difference between the Virginia testing scheme and RCW 43.43-.754 is that Virginia extended testing to *all* convicted felons, not merely those convicted of violent crimes or sex offenses. 763 F. Supp. at 843 (citing Va. Code Ann. § 19.2-310.2).

ciples, nonconsensual blood extraction under RCW 43.43.754 may be constitutional even though conducted without probable cause or a warrant. Even in what might be otherwise denominated "pure" law enforcement cases, the United States Supreme Court has crafted a number of narrow exceptions to the general warrant and probable cause requirements of the Fourth Amendment, one of which, the minimally intrusive search exception, applies here. Under the narrow balancing test associated with this exception, the nonconsensual extraction of blood from convicted sex and violent offenders passes constitutional scrutiny under the Fourth Amendment.

## A

The State concedes, as it must, that nonconsensual blood extraction under RCW 43.43.754 constitutes a search for Fourth Amendment purposes. As the Supreme Court held in *Railway Labor Executives' Ass'n*, "it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." 489 U.S. at 616. Appellants claim that, unless "special needs" applies, the existence of a search means that there is no further issue in these cases other than whether the extraction of their blood is supported by a warrant, probable cause, or individualized suspicion. Majority, at 84 (citing Brief of Appellants, at 9-11).

The United States Supreme Court has recognized a number of limited and carefully crafted exceptions to the general requirement of a warrant issued upon probable cause, exceptions which clearly apply to the criminal context. Such exceptions include searches incident to arrest, *Chimel v. California*, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969), exigent circumstances (like the imminent destruction of evidence), *Cupp v. Murphy*, 412 U.S. 291, 36 L. Ed. 2d 900, 93 S. Ct. 2000 (1973), and fixed-point police stops of motorists on public highways, *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481 (1990).

An exception to the warrant and probable cause requirements also exists for searches and seizures which involve only a minimal intrusion. The Court has applied this type of

exception to uphold "stop and frisk" searches, *Terry v. Ohio*, 392 U.S. 1, 19-20, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and brief border searches, *United States v. Martinez-Fuerte*, 428 U.S. 543, 557-60, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976), and to strike down warrantless interrogations during full-scale detention, *Dunaway v. New York*, 442 U.S. 200, 209-10, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979). *See also Sitz*, 496 U.S. at 457 (Brennan, J., dissenting). When the intrusion incurred by a given search or seizure is minimal, a reviewing court may balance the government's interest in conducting the search, the degree to which the search actually advances that interest, and the gravity of the intrusion upon personal privacy to determine whether the search is reasonable. *Brown v. Texas*, 443 U.S. 47, 50-51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979).

The minimally intrusive quality of blood extraction has repeatedly been noted. *See, e.g., Railway Labor Executives' Ass'n*, 489 U.S. at 625; *Winston v. Lee*, 470 U.S. 753, 762, 84 L. Ed. 2d 662, 105 S. Ct. 1611 (1985) ("blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity"). Since extraction under RCW 43.43.754 qualifies as minimally intrusive, it is appropriate for this court to analyze the constitutionality of the statute by examining the government's need for a DNA bank, the degree to which nonconsensual blood testing serves that need, and the burden which the testing imposes on individual privacy.

It might appear that since a form of balancing occurs both under the minimally intrusive search exception and under "special needs", it is a matter of judicial indifference which analysis applies. The choice of balancing tests, however, is critical. Because "special needs" is not limited to minimally intrusive searches or seizures, an extension of that analysis into the arena of criminal law enforcement could ultimately render the warrant requirement itself illusory. In order to prevent the extension of broad-gauged balancing tests into all corners of the Fourth Amendment, it is absolutely neces-

sary that we reject "special needs" analysis in the context of ordinary law enforcement.[88]

## B

I have concurred in the judgment of the majority in these cases because I am convinced that this balancing favors the constitutionality of RCW 43.43.754. The State's interest in developing a reservoir of information useful to prosecuting recidivists is worthy of judicial cognizance. The State also has a powerful interest in developing scientific techniques like DNA typing which have the capacity to *exculpate* criminal defendants as well as inculpate them.[89]

The nonconsensual extraction of blood and subsequent DNA testing for purposes of developing a DNA databank directly furthers these purposes. This court has affirmed the basic principle that such evidence may be admissible under certain circumstances to inculpate defendants. *State v. Cauthron*, 120 Wn.2d 879, 899, 846 P.2d 502 (1993).[90] DNA typing may also be useful in exculpating criminal defend-

---

[88]Scholars have commented on the capacity of "special needs" balancing to expand in scope and vitiate Fourth Amendment guaranties. *See, e.g.*, Nuger, *The Special Needs Rationale: Creating a Chasm in Fourth Amendment Analysis*, 32 Santa Clara L. Rev. 89, 98, 129-31 (1992); Note, Skinner v. Railway Labor Executives' Association *and the Fourth Amendment Warrant-Probable Cause Requirement: Special Needs Exception Creating a Shakedown Inspection?*, 40 Cath. U.L. Rev. 117, 150 (1990-1991). One, for example, notes that balancing tests without carefully prescribed limits can be inherently dangerous because "when an individual's suspected harmful conduct is balanced against societal interests, individual privacy losses will appear negligible in relation to government's efforts to protect society." Nuger, 32 Santa Clara L. Rev. at 95. The minimally intrusive search exception minimizes this problem by limiting its applicability to a relatively narrow category of searches.

[89]DNA typing may be employed to exculpate innocent criminal defendants. *State v. Cauthron*, 120 Wn.2d 879, 900, 846 P.2d 502 (1993) ("DNA typing yields evidence which has the potential to exculpate innocent people").

[90]Chief Justice Dore dissented in *Cauthron*, arguing that DNA typing is still insufficiently developed to constitute an acceptable means of identification under the test elaborated in *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923). 120 Wn.2d at 911. I signed Justice Dore's dissent, but recognize that the court has rejected this position. I continue to adhere to the position expressed in my concurring opinion in *State v. Kalakosky*, 121 Wn.2d

ants. Moreover, even if existing methods of DNA typing are of questionable value, the possibility exists that more precise methods will be developed in the near future. Nonconsensual blood extraction and testing is therefore closely related to the State's interest in prosecuting recidivists and exculpating innocent defendants.

The final, and in my view, determinative consideration in conducting a minimally intrusive search balancing test is the privacy interests upon which the search in question intrudes.[91] In these cases, the privacy interest is that of a convicted sex or violent offender in his or her identity. Under any form of analysis, this interest is minimal. It has been recognized that convicted persons, particularly those who are ultimately incarcerated, have a significantly diminished privacy interest. *Bell v. Wolfish*, 441 U.S. 520, 559-60, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); *Hudson v. Palmer*, 468 U.S. 517, 530, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984).

Furthermore, such individuals have a particularly limited privacy interest in the mere fact of their *identity*. The analogy to fingerprinting is extremely persuasive, in that both DNA typing and fingerprinting impinge on similar privacy interests. While the Fourth Amendment does impose certain constraints upon the fingerprinting of free persons, *Davis v. Mississippi*, 394 U.S. 721, 727-28, 22 L. Ed. 2d 676, 89 S. Ct. 1394 (1969), the constitutionality of fingerprinting convicted persons, even accused persons, is unquestioned. *See Jones v. Murray*, 962 F.2d 302, 306-07 (4th Cir.), *cert. denied*, ___ U.S. ___, 121 L. Ed. 2d 378, 113 S. Ct. 472 (1992). Since DNA typing is functionally equivalent to fingerprinting, noncon-

---

525, 551, 852 P.2d 1064 (1993) (Utter, J., concurring), that if DNA typing evidence is to be admitted in a criminal proceeding, it should be in association only with the most conservative estimates of its reliability.

[91]This part of the balancing test does not simply restate the threshold inquiry as to whether the given search or seizure was minimally intrusive. While similar considerations may bear on whether a search was minimally intrusive and the character of the privacy interests intruded upon, the two need not be the same. For example, a search may be minimally intrusive (*e.g.*, blood extraction), yet bear heavily on privacy interests (*e.g.*, testing the extracted blood for the HIV virus).

sensual blood extraction for DNA typing therefore intrudes upon a necessarily diminished privacy interest.

Importantly, nonconsensual blood extraction and testing under RCW 43.43.754 does not conflict with the purposes of the warrant requirement of the Fourth Amendment. "A warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope." *Railway Labor Executives' Ass'n*, 489 U.S. at 622. "[It] also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case." *Railway Labor Executives' Ass'n*, 489 U.S. at 622. Here, the structure of the DNA typing scheme essentially fulfills these functions. Since the use of blood samples obtained under RCW 43.43.754 is limited exclusively to DNA typing, the burden upon privacy interests is narrowly cabined. Also, since the DNA typing scheme uniformly applies to a designated category of individuals, there is no room for the imposition of the testing in an arbitrary and oppressive fashion. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 n.2, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (1989) (Fourth Amendment prevents " 'arbitrary and oppressive interference with the privacy and personal security of individuals") (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976)).

In sum, I believe the limited balancing mandated by the "minimally intrusive search" exception to the general warrant and probable cause requirements of the Fourth Amendment favors the constitutionality of nonconsensual blood extraction under RCW 43.43.754.

It is worth pointing out reasons I believe this approach, based on traditional Fourth Amendment principles, is superior to the "special needs" analysis adopted by the majority. First, the approach I have described here makes the constitutionality of RCW 43.43.754 clearly dependent upon the class of persons upon which it was designed to operate, convicted sex and violent offenders. We would be appalled, I hope, if the State mandated nonconsensual blood tests of the public at large for pur-

poses of developing a comprehensive Washington DNA databank. The Fourth Amendment guaranty against unreasonable searches and seizures would mean little indeed if it did not protect citizens from such oppressive government behavior. Under this analysis, such a testing program would clearly be unconstitutional.

Second, this approach rests heavily on the close fit between the purposes of establishing the DNA database and the process by which the testing takes place. It would, therefore, not support the testing of the blood samples obtained for purposes other than establishing the DNA databank. As the Supreme Court has recognized, the testing of blood following extraction may constitute an independent search for purposes of the Fourth Amendment. *See Railway Labor Executives' Ass'n*, 489 U.S. at 616 ("ensuing chemical analysis of the sample . . . is a further invasion"); *see also National Treasury Employees Union*, 489 U.S. at 679. Were the blood samples extracted under RCW 43.43.754 to be tested for purposes other than the limited statutory purpose of DNA typing, this additional testing would be subject to further Fourth Amendment scrutiny.

Lastly, a minimally intrusive search approach avoids the conceptual difficulty of applying a form of analysis which was developed in the context of administrative searches to the field of normal law enforcement. If we extend the broad scope of "special needs" balancing to the context of law enforcement, even the traditional requirement of a warrant issued upon probable cause may be subject to being balanced away when governmental needs appear strong enough. In upholding the DNA typing scheme established by the Legislature, we should emphatically reject the applicability of "special needs" analysis.

### III

When determining the constitutionality of novel and potentially intrusive new forms of law enforcement such as nonconsensual blood testing for DNA typing, courts must exercise the greatest care not to inadvertently erode the precious guaranties of personal liberty embodied in the Fourth Amendment.

The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.

*Almeida-Sanchez v. United States*, 413 U.S. 266, 273, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973). In my view, upholding RCW 43.43.754 requires only that we apply the traditional principles of Fourth Amendment law; it does not require us to dilute that law either by applying broad-gauged "special needs" balancing to law enforcement searches or by endorsing a rationale which would extend beyond the identification of convicted sex and violent offenders. In this fashion, we may permit the State to develop new and innovative techniques of law enforcement without sacrificing our "resolute loyalty to constitutional safeguards."

JOHNSON, J., concurs with UTTER, J.