IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 79802-2-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| STEVEN NICKOLAS VANDESTEEG, | UNPUBLISHED OPINION |
| Appellant. | |

CHUN, J. — The State charged Steven Vandesteeg with theft of a motor vehicle and possession of a stolen vehicle. The trial court severed the charges and conducted a jury trial for the theft charge and a bench trial for the possession charge. A jury found Vandesteeg guilty of theft, and the trial court found him guilty of possession of a stolen vehicle. We affirm.

I. BACKGROUND

A. Facts

Early one morning in the late summer of 2018, Loi Pham discovered that a white Acura Legend, which his father left with him, was missing from his driveway. His wife, Kelly Pham, woke around the same time and saw a notification from their NEST security camera on her phone. Review of the security camera footage showed two men getting into the car and driving it away. Pham[1] reported the stolen car to the police. Bellevue Police Officer Justin

---

[1] We refer to Loi Pham, and not Kelly Pham, as "Pham."

Citations and pin cites are based on the Westlaw online version of the cited material.

Cooper arrived, watched the tape, and saw that the theft occurred around 4:30 a.m.

Later the same morning, Officer Cooper received a call about another car theft in the same neighborhood. Chang Du reported that his red Acura Integra was missing. He last saw the car around 11:00 p.m. the night before.

As part of his investigation, Officer Cooper went to a Shell service station close to both Pham's and Du's homes and asked to view their security footage. The footage showed a white Acura and a red Honda pulling into the station at 4:36 a.m. The white Acura had the same features as the one stolen from Pham. The two cars stopped, and the driver of the red Honda got into the passenger seat of the white Acura; the two drivers looked like the men on the NEST camera footage. The white Acura left the Shell station.

The Shell station footage also showed a red Acura with the same features as the stolen one pull into the station later the same morning. Two men, who looked like the men in the white Acura earlier that morning, got out of the red Acura. A cashier saw the two men enter the store, and one used the Shell station phone. Around 7:00 a.m., an American Automobile Association (AAA) tow truck arrived and towed the red Honda away. The two men got into the red Acura and left with the tow truck.

Bellevue Police Detective Jeffery Christiansen contacted AAA and requested the address where the red Honda was towed. AAA gave him a Kent address. A Bellevue Police Special Operations Group went to the address the same afternoon. A red Honda was parked at the address when the officers

2

arrived. The two suspects drove up in the red Acura. Officers later identified the driver as Collin O'Neill and the passenger as Vandesteeg. They appeared to be the men on the Shell station footage and the NEST camera footage. The red Acura no longer had a license plate on the outside; instead it had a temporary trip permit affixed to the window.

The officers arrested the suspects and conducted a search incident to arrest; on Vandesteeg they found a key ring of shaved keys, commonly used by tow truck drivers to unlock and start cars. A detective sergeant recovered the white Acura the same day in Newport Hills.

B. Procedural History

The State charged Vandesteeg with theft of a motor vehicle for the white Acura and possession of a stolen vehicle for the red Acura. The trial court severed the charges. Vandesteeg chose a jury trial on the theft charge and a bench trial on the possession charge. The trial court excluded evidence of the red Acura during the jury trial.

1. The jury trial

Before the jury trial, Vandesteeg moved in limine to exclude evidence of the shaved keys found in his possession. The trial court denied the motion but ruled that the State could not offer testimony that the keys were used to steal the white Acura.

During trial, the State introduced the NEST security camera footage of Pham's driveway, which depicted two men matching O'Neill's and Vandesteeg's appearance taking the white Acura out of the driveway. The State introduced the

3

Shell station footage showing a man—who looked similar to one of the men on the NEST footage and similar to Vandesteeg—driving the white Acura. The footage also showed a man—who looked similar to the other man from the NEST footage and similar to O'Neill—getting into the white Acura. The State also introduced a photograph of Vandesteeg on the day of his arrest, depicting the similarities in his appearance to the driver of the white Acura on the Shell station footage.

While testifying, both Detective Daniel Finan and Officer Cooper mentioned the existence of another stolen vehicle. Vandesteeg moved for a mistrial both times, claiming a violation of the trial court's order and that this testimony prejudicially suggested that he was involved in more than one theft. The court denied the motions but instructed the jury to disregard the comments. Also, Detective Jeffrey Christiansen testified that O'Neill had "suspected methamphetamine" on him at the time of arrest. Vandesteeg moved for a mistrial for a third time, which motion the trial court denied, noting that O'Neill's possession of drugs did not prejudice Vandesteeg. A jury found Vandesteeg guilty of theft of a motor vehicle.

2. The bench trial

Before the bench trial, while Vandesteeg was in jail, the State moved to obtain his fingerprints to compare them to ones found on the temporary trip permit from the red Acura. The trial court granted the motion over Vandesteeg's objection. Vandesteeg moved again to exclude the shaved keys, which motion the trial court denied.

4

During trial, the State introduced the Shell station footage showing two men who looked similar to the men in the white Acura earlier that morning, getting out of the red Acura. An officer testified that O'Neill and Vandesteeg drove up to the Kent address in the stolen red Acura. Also, Bellevue Police forensic technician, Aleah Moe, testified that she processed the temporary trip permit from the red Acura and identified fingerprints and palm-prints matching Vandesteeg's. The court found Vandesteeg guilty of possession of a stolen motor vehicle.

Vandesteeg appeals both convictions.

## II. ANALYSIS

### A. Admission of Shaved Keys

Vandesteeg says that the trial court erred by admitting evidence of the shaved keys in his possession. He contends that they constitute improper propensity evidence under ER 404(b) and should have been excluded. And he asserts that the trial court failed to conduct an ER 404(b) analysis on the record. The State counters that the shaved keys were "inextricably linked" to the charges and thus possession of the keys was not a prior bad act under ER 404(b). We conclude that any error was harmless.

If the trial court improperly admitted evidence, we analyze whether the error was harmless. State v. Dillon, 12 Wn. App. 2d 133, 146, 456 P.3d 1199, review denied, 195 Wn.2d 1022, 464 P.3d 198 (2020). We apply the non-constitutional harmless error standard and ask "whether there is a reasonable probability that, without the error, 'the outcome of the trial would have been

materially affected.'" State v. Gower, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014) (quoting State v. Gresham, 173 Wn.2d 405, 433, 269 P.3d 207 (2012)).

The abundance of other evidence in the two trials shows that the outcome of the trials would have been the same without the shaved keys. During the jury trial on the theft charge[2] the State introduced the NEST security camera footage showing a man who looked like Vandesteeg taking the white Acura out of Pham's driveway. The man's appearance matched a photograph taken of Vandesteeg at the time of arrest, the same day as the theft. The State also introduced security camera footage of a man driving a white Acura into the Shell station who, from inside the car, had a similar appearance as one of the men on the NEST camera footage and as Vandesteeg on the day of arrest. During the bench trial on the possession charge,[3] the State introduced security camera footage of a man who looked like Vandesteeg getting into the red Acura. And Vandesteeg was arrested getting out of the red Acura later that day. A forensic technician testified that finger and palm prints found on the temporary trip permit in the red Acura matched Vandesteeg's. To be sure, if the court did err, the error was harmless.

B. Jury Instructions on Theft Charge

Vandesteeg says that the trial court instructed the jury on uncharged and unsupported alternative means for the theft charge in violation of his

---

[2] Theft of a motor vehicle occurs when one wrongfully obtains the "property or services of another . . . with intent to deprive [them] of such property." RCW 9A.56.065; RCW 9A.56.020(1).

[3] Possession of a stolen vehicle occurs when one possesses "stolen property knowing that it has been stolen" and withholds the property from the true owner. RCW 9A.56.068; RCW 9A.56.140.

constitutional rights. He claims that jury instructions 9, 10, and 11 violated his right to be informed of the charges against him under the Sixth Amendment to the United States Constitution and article I, section 22 of the state constitution, and his right to a unanimous jury under article I, section 21 of the state constitution. The State responds that Vandesteeg invited the claimed error as to jury instruction 9 and otherwise waived his objections. We agree with the State.[4]

"Under the doctrine of invited error, a party may not request an instruction and then later complain on appeal that the instruction was given, even if the error is of a constitutional magnitude." City of Seattle v. Patu, 108 Wn. App. 364, 374, 30 P.3d 522 (2001), aff'd, 147 Wn.2d 717, 58 P.3d 273 (2002); see also State v. Winings, 126 Wn. App. 75, 89, 107 P.3d 141 (2005) ("even where constitutional rights are involved, we are precluded from reviewing jury instructions when the defendant has proposed an instruction or agreed to its wording."); State v. Noel, 51 Wn. App. 436, 439, 753 P.2d 1017 (1988) (noting that even if a claim of error concerns a lack of jury unanimity, appellate courts still may decline to review it if the party appealing the claimed error proposed the instruction).

Also, we "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a); State v. O'Hara, 167 Wn.2d 91, 97–98, 217 P.3d 756 (2009), as corrected (2010). But a party may raise a claim of error for the first time on appeal if it is a "manifest error affecting a constitutional right." RAP

---

[4] Vandesteeg also presented a brief argument that the definitional instructions contained misstatements of the law. But he waived this argument, which he did not preserve at trial. See RAP 2.5(a); State v. O'Hara, 167 Wn.2d 91, 97–98, 217 P.3d 756 (2009), as corrected (Jan. 21, 2010).

7

2.5(a)(3); O'Hara, 167 Wn.2d at 97–98. "Instructing the jury on uncharged alternatives is a manifest error affecting a constitutional right that this court will address for the first time on appeal." State v. Sanchez, 14 Wn. App. 2d 261, 267, 471 P.3d 910 (2020). But a failure to define terms from a to-convict instruction is not a manifest constitutional error. O'Hara, 167 Wn.2d at 101. To raise a claim of error for the first time on appeal, an appellant must "identify a constitutional error and show how the alleged error actually affected the [appellant]'s rights at trial." Id. at 98 (alteration in original) (quoting State v. Kirkman, 159 Wn.2d 918, 926–27, 155 P.3d 125 (2007).

Jury instruction 9 is a to-convict instruction:

> To convict the defendant of the crime of theft of a motor vehicle, each of the following three elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about September 4, 2018, the defendant *wrongfully obtained* or *exerted unauthorized control* over a motor vehicle of another.

(Emphasis added.) Vandesteeg contends that "exerted unauthorized control" was an uncharged alternative means because the charging document stated only that Vandesteeg "wrongfully obtain[ed]" the white Acura.

Jury instruction 10 is a definitional instruction:

> Theft means to wrongfully obtain or *exert unauthorized control* over the property or services of another, or the value thereof, with intent to deprive that person of such property or services *by color or aid of deception*, to obtain control over the property or services of another, or the value thereof, with intent to deprive that person of such property or services.

(Emphasis added.) Vandesteeg contends that "exert unauthorized control" and "by color or aid of deception" are uncharged alternative means. Jury instruction

11 is also a definitional instruction and it states:

> "Wrongfully obtains" means to take wrongfully the property or services of another. To "exert unauthorized control" means, having any property or services in one's possession, custody or control, as a partner, to secrete, withhold or appropriate the same to his or her own use or to the use of any person other than the true owner or person entitled thereto.

Vandesteeg says that the separate definitions for "wrongfully obtains" and "exert unauthorized control" mean that the two constitute alternative means.

But the invited error doctrine bars Vandesteeg from assigning error to jury instruction 9 because he proposed it. We thus decline to address Vandesteeg's arguments about this instruction.

Under RAP 2.5(a), we also decline to address Vandesteeg's arguments as to definitional instructions 10 and 11. Vandesteeg did not object to these jury instructions below. Thus, Vandesteeg may not assign error to the instructions unless their use amounted to manifest constitutional error under RAP 2.5(a)(3).

The manifest constitutional error exception does not apply here. First, the instructions at issue are definitional, they are not to-convict instructions that would provide alternative means for the crime to occur. See State v. Linehan, 147 Wn.2d 638, 646, 649, 56 P.3d 542 (2002) (noting that statutory definitions do not create additional means of theft). And second, even if the definitional instructions were constitutionally erroneous, Vandesteeg has not established manifest error warranting review. Nothing in Vandesteeg's briefing shows "how the alleged error actually affected [his] rights at trial." O'Hara, 167 Wn.2d at 98. Thus, we do not review this claim of error, which is raised for the

9

first time on appeal.

C. Motions for a Mistrial

Vandesteeg says that the trial court erred by denying his motions for a mistrial following testimony during the jury trial about another stolen vehicle and suspected drugs found on O'Neill. We disagree.

We review a trial court's denial of a motion for a mistrial for abuse of discretion. State v. Whitaker, 6 Wn. App. 2d 1, 25, 429 P.3d 512, review granted in part, 193 Wn.2d 1012, 443 P.3d 800 (2019), and aff'd, 195 Wn.2d 333, 459 P.3d 1074 (2020)). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons." State v. Brooks, 195 Wn.2d 91, 97, 455 P.3d 1151 (2020). We will overturn a trial court's denial of a mistrial only "when there is a 'substantial likelihood' that the error prompting the request for a mistrial affected the jury's verdict." Whitaker, 6 Wn. App. 2d at 25; see also State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (a "trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure [sic] that the defendant will be tried fairly."). We note that the trial court is "best suited" to determine the prejudice of a statement. State v. Young, 129 Wn. App. 468, 473, 119 P.3d 870 (2005).

"In determining the effect of an irregularity, we examine (1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it." State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (quoting Sofie v. Fibreboard Corp., 112 Wn.2d 636, 667, 771 P.2d 711, amended, 780 P.2d 260 (1989)).

10

When the trial court severed trials for the theft and possession charges, it expressed concern that the State may try to introduce evidence from one trial during the other trial. The court ordered that the State would not be "permitted to refer to the status of the red Acura as being stolen, nor [could] the State do that by implication."

Detective Finan testified that they were "working a case involving a couple of stolen vehicles." Vandesteeg objected and, outside the presence of the jury, moved for a mistrial based on the violation of the court's order and concerns of prejudice. The trial court denied the motion, noting that the detective's testimony was "limited" and "did not make any express connection between Mr. Vandesteeg and any supposed other stolen vehicle." The court also noted that any implied reference to another stolen vehicle could be cured by a motion to strike. The trial court stated that the testimony had not violated its order but urged the State to "curtail" mentions of another stolen vehicle. Vandesteeg then moved to strike the testimony. The trial court instructed the jury to disregard the detective's comment.[5]

Also during the jury trial, Officer Cooper stated that during his investigation he looked "around for video footage from the additional [motor vehicle] theft." After the jury was excused, Vandesteeg moved for a mistrial claiming that the testimony violated the court's order. The trial court denied the motion stating that

___

[5] The trial court stated, "I'm instructing you to disregard that testimony. We are here talking about an alleged theft of one vehicle. You are not to rely upon the detective's testimony to conclude or speculate as to whether there were any other vehicles involved in this matter."

the officer's statement was not sufficiently connected to Vandesteeg to warrant a mistrial. But the court noted its prior order barring such evidence and warned the State that multiple references to another stolen vehicle could have a "cumulative effect." Vandesteeg moved to strike and the trial court gave the jury similar instructions to disregard the officer's comment.

Finally, Detective Christiansen testified that another detective found "suspected methamphetamine" on O'Neill at the time of arrest. Vandesteeg moved for a mistrial outside the presence of the jury. The trial court denied the motion, concluding that the statement did not rise "to the level of improper practice" to justify a mistrial. The court noted that the statement did not implicate ER 404(b) and was unlikely to stand out to the jury given that drugs were not at issue in the case.

The trial court acted within its discretion by denying Vandesteeg's motions for a mistrial.

First, the "irregularities" were not serious enough to require a new trial. As the trial court noted, neither comment about a different stolen vehicle was tied to Vandesteeg. The testimonies did not discuss the make or model of the other stolen vehicle, the neighborhood it was stolen from, or the day or time that it was stolen. As far as the jury knew, the other vehicle theft was unrelated to Vandesteeg. Also, O'Neill's suspected possession of drugs was unlikely to affect the jury's verdict. The trial court reasonably noted that the drugs were not found in Vandesteeg's possession and the charged crime is unrelated to drugs.

As for the second factor, none of the contested testimony was cumulative. No other evidence of other stolen cars or drugs was introduced at trial.

Third, the trial court properly instructed the jury to disregard the two comments about another stolen vehicle. Vandesteeg moved to strike those two comments, and the court gave the jury instructions to disregard them. These instructions were proper. See Emery, 174 Wn.2d at 766 ("the trial court excused the jury and then properly instructed the jury to disregard Olson's initial outburst."). And "[j]urors are presumed to follow the court's instructions." In re Pers. Restraint of Phelps, 190 Wn.2d 155, 172, 410 P.3d 1142 (2018).

The trial court acted within its discretion in not giving an instruction about the drug comment. Vandesteeg did not move to strike and the court did not instruct the jury on the comment about drugs. But the trial court had not issued an order excluding testimony about the drugs, unlike the order excluding testimony about the red Acura. And as the court recognized, the risk of prejudice stemming from a comment about drugs found on O'Neill was low.

Given these factors, and the abundance of evidence against Vandesteeg discussed above, no "substantial likelihood" exists that the three statements affected the jury's verdict. See Hopson, 113 Wn.2d at 286 ("the jury had overwhelming evidence favoring conviction."). The trial court did not abuse its discretion in denying Vandesteeg's motions for mistrial.[6]

---

[6] Vandesteeg says that even if each statement on its own does not warrant reversal, the cumulative error doctrine requires reversal. See Emery, 174 Wn.2d at 766 ("Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors results [sic] in a trial that is fundamentally unfair."). We do not reach

D. Discovery Order for Fingerprints

Vandesteeg says that the trial court ordered that his fingerprints be taken in violation of article I, section 7 of the state constitution and the Fourth Amendment to the United States Constitution. The State responds that he did not have a privacy interest in his fingerprints, and even if he did, the fingerprints were collected under lawful authority. We conclude that the trial court did not err because Vandesteeg did not have a constitutionally protected privacy interest in his fingerprints.

We review de novo issues of constitutional law. State v. Cornwell, 190 Wn.2d 296, 300, 412 P.3d 1265 (2018).

"When presented with arguments under both the state and federal constitutions, we review the state constitution arguments first." State v. Surge, 160 Wn.2d 65, 70, 156 P.3d 208 (2007). Article I, section 7 states: "No person shall be disturbed in [their] private affairs, or [their] home invaded, without authority of law." To determine whether article I, section 7 applies, we conduct a two-part analysis. Id. at 71. First, we ask "whether the action complained of constitutes a disturbance of one's private affairs." Id. If so, we ask "whether authority of law justifies the intrusion." Id.

The State sought Vandesteeg's fingerprints for the bench trial, and Vandesteeg objected. Vandesteeg was in jail at the time. The trial court ordered

---

this question because we conclude that the court did not err in connection with the statements.

the taking of Vandesteeg's fingerprints under CrR 4.7(b)(2).[7]  In granting the State's motion, the trial court noted that the process was nonintrusive and noninvasive.

Vandesteeg cites no law indicating that taking fingerprints from a defendant in custody is a disturbance of private affairs under article I, section 7. Vandesteeg relies on Surge, and State v. Garcia-Salgado, 170 Wn.2d 176, 240 P.3d 153 (2010) to support his argument.  Garcia-Salgado holds that a DNA cheek swab of a defendant who has yet to be convicted "constitutes a search under the Fourth Amendment and article I, section 7."  170 Wn.2d at 184.  And Surge, in upholding the constitutionality of a statute authorizing the collection of DNA from those convicted of certain crimes for identification purposes, holds that "no distinction" exists between collecting DNA and fingerprints from felons for identification purposes.  160 Wn.2d at 74.  Vandesteeg says that no distinction exists between fingerprinting and DNA collection, and that collecting DNA from a pretrial defendant is a search, and thus fingerprinting is also a search under article I, section 7.

Yet Garcia-Salgado is distinguishable because a DNA cheek swab involves an intrusion into the body that is not required for fingerprinting.[8]  170

---

[7] "Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, the court on motion of the prosecuting attorney or the defendant, may require or allow the defendant to: . . . (iii) be fingerprinted." CrR 4.7(b)(2).

[8] See also State v. Athan, 160 Wn.2d 354, 405, 158 P.3d 27 (2007) (fingerprints are distinguishable from DNA because "[l]ike DNA, a fingerprint identifies a person, but unlike DNA, a fingerprint says nothing about the person's health, their propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct.").

Wn.2d at 184 (emphasizing the "intrusion into the body" in its holding). And Surge does not say that fingerprinting and DNA collection are identical and should be treated the same in all cases. The portion of the Surge opinion Vandesteeg relies on is specific to felons and identification purposes.[9] 160 Wn.2d at 74. The court in Surge did not hold that taking fingerprints invokes a privacy interest protected under article I, section 7.

We thus look to cases interpreting the privacy interest protected under the Fourth Amendment to inform our analysis.[10] Washington courts have interpreted the Fourth Amendment as not protecting one's fingerprints.[11] In State v. Athan our Supreme Court said that "[p]hysical characteristics which are exposed to the public are not subject to Fourth Amendment protection." 160 Wn.2d 354, 374, 158 P.3d 27 (2007). A concurring opinion in State v. Olivas noted that "[w]hile the Fourth Amendment does impose certain constraints upon the fingerprinting of free persons, . . . the constitutionality of fingerprinting convicted persons, even

---

[9] The court in Surge noted that the constitutional rights afforded to a person can depend on their status, such as pretrial detainee. 160 Wn.2d at 74.

[10] "[W]hile the structural differences in federal and state constitutions mean[ ] the federal analysis is not binding upon our state constitutional analysis, it can still guide us because both recognize similar constitutional principles." State v. Lakotiy, 151 Wn. App. 699, 712–13, 214 P.3d 181 (2009) (second alteration in original) (quoting Surge, 160 Wn.2d at 71 n.4).

[11] Federal courts have reached the same conclusion. They have noted that it is "elementary" that people in custody may be fingerprinted for identification purposes. Maryland v. King, 569 U.S. 435, 459, 133 S. Ct. 1958, 186 L. Ed. 2d 1 (2013) (quoting Smith v. United States, 324 F.2d 879, 882 (C.A.D.C.1963)); see also United States v. Mitchell, 652 F.3d 387, 411 (3d Cir. 2011) ("it is 'elementary' that blanket fingerprinting of individuals who have been lawfully arrested or charged with a crime does not run afoul of the Fourth Amendment."); Napolitano v. United States, 340 F.2d 313, 314 (1st Cir. 1965) (stating that the taking of fingerprints in connection to bail for use by an expert witness was "universally standard procedure," and not a "violation of constitutional rights.").

accused persons, is unquestioned." 122 Wn.2d 73, 106, 856 P.2d 1076 (1993) (Utter, J. concurring) (internal citation omitted); see also State v. Martines, 182 Wn. App. 519, 530, 331 P.3d 105 (2014), rev'd on other grounds, 184 Wn.2d 83, 355 P.3d 1111 (2015) ("one has no reasonable expectation of privacy in one's . . . fingerprints" under the Fourth Amendment). Finally, in State v. Bachman, the court held that fingerprints obtained without a warrant and without a CrR 4.7 order did not violate the Fourth Amendment. Noted at 153 Wn. App 1002, 2009 WL 3756790 at *5, review granted, cause remanded, 172 Wn.2d 1009, 260 P.3d 208 (2011) ("the law is clear that the State could lawfully compel him to provide fingerprints while he was in custody"); see GR 14.1 ("Washington appellate courts should not, unless necessary for a reasoned decision, cite to unpublished opinions.").[12]

We affirm.

_____
Chun, J.

WE CONCUR:

_____          _____
                                           Dwyer, J.

---

[12] We do not reach the issue of whether lawful authority justified the intrusion because we decide that taking Vandesteeg's fingerprints did not disturb his private affairs.

17